No. 23-60216

---

# In the United States Court of Appeals for the Fifth Circuit

———————————

John M. Barr; John McPherson,

*Petitioners*,

v.

Securities and Exchange Commission,

*Respondent.*

———————————

On Petition for Review of a Final Order
of the U.S. Securities and Exchange Commission

———————————

## RECORD EXCERPTS OF PETITIONER JOHN MCPHERSON

———————————

Brian J. Leske
ASHCROFT LAW FIRM LLC
200 State Street, 7th Floor
Boston, MA 02109
Telephone: (617) 573-9400
bleske@ashcroftlawfirm.com

*Counsel for Petitioner
John McPherson*

# **TABLE OF CONTENTS**

**Tab #**                                                        **ROA.23-60216.**[1]

1. "Final Order" – Order Determining Whistleblower Award Claims, Securities Exchange Act of 1934 Release No. 97202, Whistleblower Award Proceeding File No. 2023-42, Notice of Covered Action No. 2015-036, dated March 27, 2023 ........................................................ ROA.1785-1795

2. Petition for Review by Petitioner John McPherson (w/o redacted Final Order) ................................................. Dkt. No. 23-1

3. Order Granting Motion to Transfer, Case No. 22-1121 (D.C. Cir. May 12, 2023) ..................... Dkt. No. 23-2

4. "SEC Receiver Mot." – SEC Opposed Emergency Motion For Appointment of Receiver, *SEC v. Life Partners Holdings, Inc., et al.*, No. 12-cv-00033, Dkt. No. 325 (W.D. Tex. Jan. 5, 2015) ............................................................... N/A

5. "UST Trustee Mot." – United States Trustee's Motion For An Order Directing The Appointment Of A Chapter 11 Trustee, *In re: Life Partners Holdings, Inc.*, No. 15-40289-RFN-11, Dkt. No. 27 (Bankr. N.D. Tex. Jan. 26, 2015). ............................ N/A

6. "Trustee LPI Mot." – Trustee's Emergency Motion to Amend the Governing Documents and To File Voluntary Chapter 11 Petitions for Debtor's Subsidiaries, *In re: Life Partners Holdings, Inc.*, No. 15-40289-RFN-11, Dkt. No. 240 (Bankr. N.D. Tex. Mar. 25, 2015) ................................................ N/A

7. Certificate of Service

---

[1] For the sake of brevity in the electronic administrative record, the Commission reproduced only the first page of documents that are publicly available (*e.g.*, on a federal judicial docket). Dkt. No. 39. Citations therefore may be directly to a federal court docket.

# TAB 1

Non-Public

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 97202 / MARCH 27, 2023

WHISTLEBLOWER AWARD PROCEEDING
File No. 2023-42

---

In the Matter of the Claims for an Award

in connection with

*SEC v. Life Partners, Inc., et al.,*
12-CV-00002 (W.D. Tex., filed Jan. 3, 2012)

Notice of Covered Action 2015-036

---

## ORDER DETERMINING WHISTLEBLOWER AWARD CLAIMS

The Claims Review Staff ("CRS") issued Preliminary Determinations recommending that (i) John McPherson ("Claimant 1") receive a whistleblower award equal to twenty-three percent (23%) of the monetary sanctions collected, or to be collected, in connection with the above referenced Covered Action (the "Covered Action"); (ii) ██████████ ("Claimant 2") receive a whistleblower award equal to ██ percent (█%) of the monetary sanctions collected, or to be collected, in connection with the Covered Action; and (iii) the whistleblower award applications submitted by ██████████ ("Claimant 3") and ██████████ ("Claimant 4") in connection with the Covered Action be denied. Each of the Claimants filed a timely response contesting the Preliminary Determination.

After review of the reconsideration requests and additional information submitted by Claimant 4, we find Claimant 4 to be eligible for an award. Accordingly, we reallocate a maximum thirty percent award among Claimants 1, 2, and 4 and (i) award Claimant 1 twenty percent (20%) of the monetary sanctions collected or to be collected in the Covered Action, equal to over $21,000, (ii) award Claimant 2 ██ percent (█%) of the monetary sanctions collected or to be collected in the Covered Action, equal to over $5,000, and (iii) award Claimant 4 ██ percent (█%) of the monetary sanctions collected or to be collected in the Covered Action, equal to over $5,000. We deny an award to Claimant 3.

## I.  Background

### A.  The Covered Action

In April 2010, staff in the United States Securities and Exchange Commission's ("Commission") Division of Enforcement ("Enforcement") opened a matter under inquiry to investigate certain conduct by Life Partners Holdings, Inc. (the "Company"), a public company in the business of brokering life settlements.  On January 3, 2012, the Commission filed a civil action in federal district court charging the Company and three of its officers with violations of the anti-fraud provisions of the federal securities laws.  *SEC v. Life Partners, Inc., et al.,* 12-CV-00002 (W.D. Tex.).  The Commission's Complaint alleged, among other things, that the Company systematically used life expectancies that were materially short in brokering life settlements leading to disclosure and accounting fraud.

On January 9, 2014, the district court entered a final judgment by consent in favor of the Commission that ordered one of the Company's officers, the CFO, to pay a civil penalty of $34,961.  The remaining defendants continued to trial, and the jury returned a verdict finding that each remaining defendant had violated Section 17(a)(1) of the Securities Act and that the Company violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder—and that these violations were aided and abetted by the CEO and General Counsel.  After the trial, the court set aside the Section 17(a)(1) verdict as unsupported by the evidence and declined to order reimbursement pursuant to Section 304 of the Sarbanes-Oxley Act ("SOX") against the CEO.  On January 16, 2015, the Court entered a final judgment ordering the Company to pay disgorgement of $15 million and a civil penalty of $23.7 million, and the CEO and General Counsel to pay civil penalties of $6.2 million and $2 million.  The defendants appealed the judgment.  The Commission filed a cross-appeal.

On January 20, 2015, the Company filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the Northern District of Texas, Case No. 15-40289-rfn-11 (the "Bankruptcy Action").  On December 9, 2016, the Revised Third Amended Plan of Reorganization of the Company became effective.  The plan established a trust to oversee the liquidation of the Company's assets and the distribution of the net proceeds to the Company's defrauded investors.  As part of the plan, the Commission received a Creditor's Trust Interest up to the amount of the Commission's Judgment Claim of $38.7 million and agreed that any distributions in respect of its Creditor's Trust Interest would be reallocated to investors.  In return, the Company dismissed its appeal.  The Commission also dismissed its cross-appeal.

As to the CEO and General Counsel, the Fifth Circuit reinstated the Section 17(a)(1) jury verdict and ordered the district court to reassess penalties as well as reimbursement against the CEO under Section 304 of SOX.  On September 28, 2018, on remand, the district court ordered (i) the CEO and General Counsel each to pay $6,500 in civil penalties for their Section 17(a) violations; (ii) the CEO to pay $3,555,000 in civil penalties for aiding and abetting the Company's Section 13(a) violations, (iii) the General Counsel to pay $2,000,000 in civil penalties for aiding and abetting the Company's Section 13(a) violations; and (iv) the CEO to reimburse the Company in the amount of $1,325,566 under Section 304 of SOX.

On April 1, 2015, the Office of the Whistleblower posted a Notice of Covered Action on the Commission's public website inviting claimants to submit whistleblower award applications within ninety days. Claimant 1, Claimant 2, and Claimant 4 submitted timely award claims on Form WB-APP. Claimant 3 submitted a claim on Form WB-APP on ████████████, almost two months after the deadline.

## B.    The Preliminary Determinations

The CRS issued Preliminary Determinations[1] recommending that Claimant 1 receive a whistleblower award of 23% and Claimant 2 receive a whistleblower award of █% of the monetary sanctions collected, or to be collected, in the Covered Action.

The CRS recommended that Claimant 4's application be denied because Claimant 4 did not submit information that led to the successful enforcement of the Covered Action within the meaning of Section 21F(b)(1) of the Exchange Act and Rules 21F-3(a)(3) and 21F-4(c) thereunder. In reaching the Preliminary Determination, the CRS noted that (i) the Enforcement staff opened the underlying investigation more than three years before Claimant 4 submitted his/her tip to the Commission; (ii) Claimant 4 did not testify at trial ██████████████████████; (iii) although Claimant 4's information assisted the staff in preparing the Commission's motion ██████████████ the court denied that motion ██████████████ ████; and (iv) Claimant 4's assistance in the bankruptcy proceedings does not qualify as having "led to the successful enforcement of" the Covered Action under Section 21F(b)(1) because it did not contribute to the process leading to the entry of the final judgment and consequent relief in the Commission's favor and also did not result in the subsequent entry of any additional relief for the violations alleged by the Commission.

The CRS also recommended that Claimant 3's application be denied because Claimant 3 did not submit information that led to the successful enforcement of the Covered Action within the meaning of Section 21F(b)(1) of the Exchange Act and Rules 21F-3(a)(3) and 21F-4(c) thereunder. In reaching the Preliminary Determination, the CRS noted that (i) the Enforcement staff opened the underlying investigation more than two years before Claimant 3 submitted his/her tip to the Commission; (ii) Claimant 3's information was not new or meaningful to the success of the Covered Action; (iii) Claimant 3 was not called to testify at the trial in the Covered Action; and (iv) while Claimant 3 identified a potential witness, Enforcement staff did not present that witness at trial. The CRS also recommended that Claimant 3's application be denied because Claimant 3 failed to meet the deadline for applying for an award in connection with the Covered Action and submitted a Form WB-APP almost two months late.[2]

---

[1]    *See* Exchange Act Rule 21F-10(d), 17 C.F.R. § 240.21F-10(d).

[2]    Exchange Act Rules 21F-10(a) ("A claimant will have ninety (90) days from the date of the Notice of Covered Action to file a claim for an award based on that action, or the claim will be barred") and 10(b)(1) ("All claim forms, including any attachments, must be received by the Office of the Whistleblower within ninety (90) calendar days of the date of the Notice of Covered Action in order to be considered for an award").

23-60216.1787

**R1686**

### C.    Claimants' Responses to the Preliminary Determinations

Claimant 1 submitted a timely written response contesting the Preliminary Determination.[3]  Specifically, Claimant 1 argues, alternatively, that (i) Claimant 1's award should be based on the amount that the Commission was "able to collect" rather than the amount it actually collected; (ii) Claimant 1's award should be based on any amounts collected by the bankruptcy trustee and distributed to defrauded investors; or (iii) the Commission should use its discretion under Section 36(a)(1) of the Exchange Act to exempt Claimant 1 from the whistleblower program rules and issue an appropriate award amount.

Claimant 2 submitted a timely written response contesting the Preliminary Determination.  Specifically, Claimant 2 argues that the Commission should use its discretion to award ▮▮▮▮▮▮ to Claimant 2.  Claimant 2 asserts that this award amount is necessary in order for Claimant 2 to recover the losses Claimant 2 suffered as a result of ▮▮▮▮▮▮ the Covered Action.

Claimant 4 submitted a timely written response contesting the Preliminary Determination.  Specifically, Claimant 4 argues that Claimant 4 is entitled to an award because Claimant 4's information led to the success of the Covered Action.  Claimant 4 claims that (i) Claimant 4 would have been an important witness were Claimant 4 allowed to testify at the trial; (ii) Claimant 4 provided new information and documents, including certain documents that the Commission introduced as evidence at trial; (iii) Claimant 4 identified a critical witness ("Witness") for the Commission at the trial; and (iv) Claimant 4 provided significant information and supporting evidence, including ▮▮▮▮▮▮▮▮▮▮ that would have been helpful to the Commission in connection with ▮▮▮▮▮▮ and that helped in the appointment of the bankruptcy trustee.  Claimant 4 also claims that even if staff were already aware of the Witness, he/she provided new, important information by telling staff that the Witness would make a good witness for the SEC at trial because of ▮▮▮▮▮▮ ▮▮▮▮▮▮.  In addition, pursuant to a request from the Office of the Whistleblower ("OWB"), Claimant 4 provided information indicating that the Commission used ▮▮▮▮▮▮ provided by Claimant 4 in obtaining additional relief in the remanded final judgment.

Claimant 3 submitted a timely written response contesting the Preliminary Determination.  Specifically, Claimant 3 argues that Claimant 3 is entitled to an award because Claimant 3's information led to the success of the Covered Action by saving the Commission time and resources in focusing on the key documents and issues.  Claimant 3 claims that:  (i) Claimant 3 had multiple communications with Enforcement staff during the litigation; (ii) during the trial, Enforcement staff relied on the information Claimant 3 provided, namely, that there was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (iii) while the Commission may already have had the information described in (ii), Claimant 3's provision of this information saved significant Commission resources; and (iv) Claimant 3 initially was asked to testify at the trial, but

---

[3]      *See* Exchange Act Rule 21F-10(e), 17 C.F.R. § 240.21F-10(e).

**R1687**

23-60216.1788

Non-Public

ultimately did not do so. Claimant 3 did not provide any explanation as to why Claimant 3 submitted the WB-APP late.

Upon further questioning by OWB as to the reason for the late WB-APP, Claimant 3's current counsel explained that Claimant 3 had been previously represented by another attorney, who had represented Claimant 3 with respect to all actions concerning the whistleblower submission and claim process. According to Claimant 3's current counsel, on ████████████, Claimant 3 was conducting an internet search regarding the status of the SEC enforcement proceeding and discovered that a Notice of Covered Action had been posted. Prior to that time, Claimant 3 was unaware of the Notice of Covered Action process, the existence or need to file Form WB-APP, or of the time requirements for filing. Claimant 3 sent the information he/she had found during the search on ████████████ to his/her then-attorney, who then submitted the WB-APP the following day, ████████████.[4] Claimant 3's current counsel asks that the Commission waive the filing deadline.

## III. Analysis

### A. Claimant 1

#### 1. Award Analysis

The record demonstrates that Claimant 1 voluntarily provided original information to the Commission that significantly contributed to the success of the Covered Action.[5] In reaching this determination, we assessed, among other things, the following facts: (i) Claimant 1 provided information early in the investigation, beginning just three months after the Commission staff opened the matter; (ii) Claimant 1's information saved the staff time and resources in conducting its investigation and included industry information that the staff likely would not have uncovered without Claimant 1's help; (iii) Claimant 1 provided continuing assistance, including communicating with the staff on many occasions and providing voluminous documents to the staff; and (iv) there is a close nexus between Claimant 1's information and several paragraphs in the Commission's Complaint.

The CRS preliminarily determined that the aggregate award in this matter should be at the statutory maximum and that Claimant 1 should receive a 23% award and that Claimant 2 should receive a ██% award because Claimant 1's information was more significant and Claimant 1 provided extraordinary ongoing assistance. Since then, Exchange Act Rule 21F-6(c) was adopted creating a presumption of a statutory maximum award of 30% where: (i) the maximum award would be $5 million or less; (ii) the claimant's application presents no negative award factors under Rule 21F-6(b) – *i.e.*, culpability, unreasonable reporting delay, or interference with

---

[4]     We note that the dates provided by Claimant 3's counsel do not comport with other aspects of the record. Claimant 3 faxed the WB-APP to OWB on ████████████, and the WB-APP was dated ████████████. As such, Claimant 3 must have become aware of the NoCA filing by no later than ████████████, and not on ████████████.

[5]     *See* Exchange Act Section 21F(b)(1), 15 U.S.C. § 78u-6(b)(1); Exchange Act Rule 21F-3(a), 17 C.F.R. § 240.21F-3(a).

R1688

23-60216.1789

an internal compliance and reporting system—and (iii) the award claim does not trigger Rule 21F-16.[6]  The Commission may depart from the presumption if:  (i) the assistance provided by the whistleblower was, "under the relevant facts and circumstances, limited," or (ii) a maximum award "would be inconsistent with the public interest, the promotion of investor protection, or the objectives of the whistleblower program."[7]

The 30% presumption applies in this matter.  Based on current collections, the statutory maximum award is approximately $32,000, and the Commission does not reasonably anticipate that future collections would cause the statutory maximum award to exceed $5 million.  No negative factors are associated with Claimant 1's application, Claimant 1 bears no responsibility for the misconduct, and Claimant 1 did not benefit financially from the wrongdoing.  There is nothing in the record that suggests Claimant 1 unreasonably delayed in reporting information to the Commission or interfered with the Company's internal compliance or reporting systems.  Also, there is no reason to depart from the presumption of the statutory maximum award.  Claimant 1 provided more than limited assistance.  Furthermore, there are no public interest, investor protection, or programmatic concerns that would warrant departure from a 30% award.

Based on these factors and all aspects of the record, and after considering Claimant 1's contributions relative to Claimant 2's and Claimant 4's contributions, we find that an award of 20% is appropriate for Claimant 1.

### 2.    Request for Reconsideration

We disagree with Claimant 1's contention that Claimant 1's award calculation should be based on a larger amount than the Commission collected in connection with the Covered Action.  Claimant 1 notes that Exchange Act Rule 21F-5(b) provides, in part, that the amount of an award "will be at least 10 percent and no more than 30 percent of the monetary sanctions that the Commission and the other authorities are able to collect."  Claimant 1 asserts that the Commission was "able to collect" a much larger amount of monetary sanctions than it in fact did collect in the Covered Action, because it voluntarily subordinated its interest in the Bankruptcy Action to the interests of defrauded investors.  As such, Claimant 1 argues that Claimant 1's award should be based on the amount that the Commission could have collected rather than the amount that the Commission actually collected.

*First*, Claimant 1's argument is based on an incorrect factual premise, as Claimant 1 assumes that the Commission could have collected the full $38.7 million had it not voluntarily subordinated its interest in the bankruptcy proceeding.  The $23.7 million civil penalty against the Company would have been disallowed or subordinated in the bankruptcy as a matter of law.  At best, the Commission, as a general unsecured creditor, could only have been able to recover a

---

[6]    Exchange Act Rule 21F-16 applies only when the claimant was ordered to pay sanctions or an entity whose liability was based substantially on conduct that the claimant directed, planned or initiated was ordered to pay sanctions in connection with the covered action. Rule 21F-16 is not applicable here.

[7]    Exchange Act Rule 21F-6(c)(1)(iv).

fraction of the disgorgement.[8]  Contrary to Claimant 1's assertions, the Commission did not simply walk away from a collection of $38.7 million, because it would only have been able to collect a *de minimis* amount, and any such collections would have been dependent upon the Commission winning on appeal.

*Second,* we decline to follow Claimant 1's interpretation of Rule 21F-5(b) because it is at odds with the statute that it is designed to implement.  Congress established the statutory minimum and maximum whistleblower awards as "(A) not less than 10 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions; and (B) not more than 30 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions."[9]  Because the statutory maximum whistleblower award is based on the amount actually collected in connection with the Covered Action, we cannot base the amount of Claimant 1's award on a higher amount that the Commission may have been able to but did not collect.

*Third*, calculating whistleblower award payments based on what the Commission hypothetically "was able to collect," but did not, would introduce uncertainty, inconsistency, and could delay the processing of award claims.

We also disagree with Claimant 1's argument that the award should be based on any amounts collected in the Bankruptcy Action.  As we noted in connection with the adoption of several rule amendments, "our statutory authority does not extend to paying whistleblower awards for recoveries in bankruptcy proceedings or other proceedings that may in some way 'result from' the Commission's enforcement action and the activities of the whistleblower."[10]  Under Section 21F of the Exchange Act, the Commission is authorized to pay whistleblower awards only on the basis of monetary sanctions that are imposed in a covered judicial or administrative action or related action.  A covered judicial or administrative action means an "action brought by the Commission under the securities laws that results in monetary sanctions exceeding $1,000,000."[11]  A related action must be brought by one of the authorities specified in the statute.[12]  Bankruptcy proceedings are not brought by either the Commission acting under the securities laws or by one of the designated related-action authorities, and orders to pay money that result from bankruptcy proceedings are not imposed in Commission covered actions or related actions.

Finally, we deny Claimant 1's request that the Commission use its discretion under Section 36(a)(1) of the Exchange Act to exempt Claimant 1 from the requirements under the whistleblower program and set Claimant 1's award amount above the statutory limit.  Section

---

[8]     The payout rate to unsecured creditors, like the Commission, was only 2.5%.  Therefore, the Commission could only have collected 2.5% of the final disgorgement, which at best would have been $375,000, 2.5% of the $15 million of disgorgement.

[9]     Exchange Act Section 21F(b)(1), 15 U.S.C. § 78u-6(b)(1).

[10]    *See* Whistleblower Program Rules, Release No. 34-899963, 2020 WL 5763381, at *12 (Sept. 23, 2020).

[11]    Exchange Act Section 21F(a)(1), 15 U.S.C. § 78u-6(a)(1).

[12]    *See* Exchange Act Section 21F(a)(5), 15 U.S.C. § 78u-6(a)(5).

23-60216.1791

36(a)(1) provides that "the Commission, by rule, regulation, or order, may conditionally or unconditionally exempt any person…from any provision or provisions of [the Exchange Act] or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors."[13]  We have used this discretionary authority to exempt whistleblowers from certain of the program's rules under limited circumstances.[14]  However, the limitation on the amount of the award to be issued in connection with any Covered Action was set by statute, and we have never used our discretion under Section 36(a)(1) of the Exchange Act to exempt a whistleblower from a statutory requirement or to approve an award amount above the statutory limit.  The text of the statute reflects a clear congressional design to grant awards of no more than 30 percent of the amounts collected.  Congress established the same framework for awards to be paid to whistleblowers in cases brought by the Commodity Futures Trading Commission[15] and under the Anti-Money Laundering Act.[16]  Given the clarity and consistency of the statutory design for whistleblower awards, the Commission does not believe it would be appropriate to use its exemptive authority to award an amount above the statutory limit even in cases such as this one, where a higher award amount might otherwise be warranted.

**B.**     **Claimant 2**

**1.**     **Award Analysis**

The record demonstrates that Claimant 2 voluntarily provided original information to the Commission that significantly contributed to the success of the Covered Action.  In reaching this determination, we assessed, among other things, the following facts: (i) Claimant 2 voluntarily submitted information to the Commission staff approximately nine months after the investigation was opened and before the Commission had filed its complaint against the Company; (2) Claimant 2 participated in an initial phone call with staff, provided documents related to Claimant 2's ███████, and provided ongoing assistance to the staff; (3) Claimant 2's information included information that was not previously known to the staff, and the information informed the direction of the staff's investigation and the charges ultimately brought against the Company.

As noted above, the presumption of a statutory maximum award of 30% applies in this matter.  Based on all aspects of the record, and after considering Claimant 2's contributions relative to Claimants 1's and Claimant 4's contributions, we find that an award of █% is appropriate for Claimant 2.

---

[13]     15 U.S.C. § 78mm(a)(1).

[14]     *See*, *e.g.*, Order Determining Whistleblower Award Claims, Release No. 34-90580 (Dec. 7, 2020) (providing whistleblower with exemption from the TCR filing requirements under Rules 21F-9(a) and (b)); Order Determining Whistleblower Award Claims, Release No. 34-86010 (June 3, 2019) (providing whistleblower with exemption from the voluntary requirement under Rule 21F-4(a)).

[15]     7 U.S C § 26(b)(1).

[16]     31 U.S.C. § 5323(b)(1).

### 2.    Request for Reconsideration

We decline Claimant 2's request that we set Claimant 2's award amount at ▉▉▉▉▉▉.
As discussed above, the limit for a whistleblower award to all meritorious claimants in the
aggregate is set by statute at 30% of the amount collected of the monetary sanctions imposed in
the action or related actions. Even if Claimant 2 were the sole meritorious claimant, which
Claimant 2 is not, a 30% award would be less than the amount Claimant 2 requests. We decline
to set Claimant 2's award above the statutory limit. Further, whistleblower award payments are
based on the amounts collected in the underlying Covered Action, not the amount of loss
suffered by the claimant.

### C.    Claimant 4's Award Analysis

The record demonstrates that Claimant 4 voluntarily provided original information to the
Commission that significantly contributed to the success of the Covered Action. Specifically, we
find that the ▉▉▉▉▉▉ provided by Claimant 4 were helpful to the Commission in
obtaining additional relief in the remanded final judgment.[17]

As noted above, the presumption of a statutory maximum award of 30% applies in this
matter. Based on all aspects of the record, and after considering Claimant 4's contributions
relative to Claimants 1's and Claimant 2's contributions, we find that an award of ▉% is
appropriate for Claimant 4.

### D.    Claimant 3

Claimants must give the Commission information in the form and manner that the
Commission requires in order to be eligible for a whistleblower award.[18] The Commission's
rules require Claimants to file any application for a whistleblower award on Form WB-APP.[19]
Further, the Form WB-APP must be filed within ninety days from the date of the Notice of
Covered Action or the claim will be barred.[20] Claimants bear the ultimate responsibility to learn
about and follow the Commission's rules regarding the award application process.[21]

The requirement that claimants file whistleblower award claims within ninety days of the
posting of a Notice of Covered Action serves important programmatic functions. The deadline
ensures fairness to potential claimants by giving all an equal opportunity to have their competing

---

[17]    We note that the other information provided by Claimant 4 did not significantly contribute to the success of
the Covered Action, because, for example, the Enforcement staff had already obtained the information through other
sources.

[18]    *See* Exchange Act Rule 21F-8(a), 17 C.F.R. § 240.21F-8(a).

[19]    *See* Exchange Act Rule 21F-10(b), 17 C.F.R. § 240.21F-10(b).

[20]    *See* Exchange Act Rule 21F-10(a), 17 C.F.R. § 240.21F-10(a).

[21]    *See* Order Determining Whistleblower Award Claim, Release No. 34-72659, at 5 (July 23, 2014).

claims evaluated at the same time.  The deadline also brings finality to the claim process so that the Commission can make timely awards to meritorious whistleblowers.[22]

Notwithstanding these important programmatic functions, the whistleblower program rules recognize that there may be rare situations where an exception should be made.  To allow for this, Rule 21F-8(a) of the Exchange Act provides that "the Commission may, in its sole discretion, waive" the filing requirements "upon a showing of extraordinary circumstances."[23]  The Commission has explained that the "extraordinary circumstances" exception is "narrowly construed" and requires an untimely claimant to show that "the reason for the failure to timely file was beyond the claimant's control."[24]  The Commission has identified "attorney misconduct or serious illness" that prevented a timely filing as two examples of the "demanding showing" that an applicant must make before the Commission will consider exercising its discretionary authority to excuse an untimely filing.[25]  The Commission has previously found that "a lack of awareness about the [whistleblower award] program does not . . . rise to the level of an extraordinary circumstance as a general matter [since] potential claimants bear the ultimate responsibility to learn about the program and to take the appropriate steps to perfect their award applications."[26]  "A potential claimant's responsibility includes the obligation to regularly monitor the Commission's web page for NoCA postings and to properly calculate the deadline for filing an award claim."[27]

Claimant 3's lack of awareness of the NoCA posting or of the 90-day deadline is not an "extraordinary circumstance" that would excuse his/her failure to submit a timely Form WB-APP.  Nothing interfered with his/her ability to monitor the Commission's web page or submit an application by the 90-day deadline.  Furthermore, there are no unique circumstances here that might support the Commission's exercise of its separate, discretionary authority under Section 36(a) of the Exchange Act to exempt Claimant 3 from the 90-day filing deadline.[28]

---

[22]     *See Securities Whistleblower Incentives and Protections*, 76 Fed. Reg. 34300, 34343 (June 13, 2011); Order Determining Whistleblower Award Claims, Release No. 95711 (Sept. 9, 2022); Order Determining Whistleblower Award Claims, Release No. 88464 (Mar. 24, 2020); Order Determining Whistleblower Award Claims, Release No. 96765 (Jan. 30, 2023).

[23]     17 C.F.R. § 240.21F-8(a).

[24]     Order Determining Whistleblower Award Claims, Release No. 77368, at 3 (Mar. 14, 2016), *pet. for rev. denied sub nom. Cerny v. SEC*, 708 F. App'x 29 (2d Cir. 2017), cert. denied, 138 S. Ct. 2005 (2018).

[25]     Order Determining Whistleblower Award Claim, Release No. 77368; Order Determining Whistleblower Award Claim, Release No. 82181 (Nov. 30, 2017).

[26]     Order Determining Whistleblower Award Claims, Release No. 95711 (Sept. 9, 2022) (citing to Order Determining Whistleblower Award Claim, Release No. 88464 (Mar. 24, 2020)).

[27]     *Id.*  The whistleblower rules provide "for constructive, not actual, notice of the posting of a covered action and of the deadline for submitting a claim."  *Id; see also* Order Determining Whistleblower Award Claims, Release No. 96765 (Jan. 30, 2023) (finding that claimant's lack of awareness about the whistleblower program and limited understanding of the whistleblower rules "failed to meet the demanding standard for showing that there were extraordinary circumstances").

[28]     *Cf.* Order Determining Whistleblower Award Claims, Release No. 92086 (June 2, 2021) (exercising Section 36(a) exemptive authority to waive the 90-day deadline where the claimant faced "unique obstacles" to timely filing the claim).

Non-Public

We therefore conclude that Claimant 3 failed to submit a claim for award on Form WB-APP to the Office of the Whistleblower within ninety days of the date of the Notice of Covered Action as required under Rule 21F-10(b) of the Exchange Act and that, as a result, Claimant 3 is ineligible for an award with respect to the Covered Action.[29]

## IV.    Conclusion

Accordingly, it is ORDERED that Claimant 1 receive an award of twenty percent (20%) of the monetary sanctions collected, or to be collected, in the Covered Action; Claimant 2 receive an award of ██ percent (█%) of the monetary sanctions collected, or to be collected, in the Covered Action; Claimant 4 receive an award of ██ percent (█%) of the monetary sanctions collected, or to be collected, in the Covered Action; and that Claimant 3's award application be denied.

By the Commission.

*Vanessa Ann Countryman*

Vanessa A. Countryman
Secretary

---

[29]    Because Claimant 3 is ineligible for an award based on the late filing of a Form WB-APP, we decline to consider whether Claimant 3's information led to the success of the Covered Action.

# TAB 2

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| JOHN DOE (CLAIMANT #1), | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | Case No. 23-1121 |
| | ) | |
| U.S. SECURITIES AND | ) | |
| EXCHANGE COMMISSION, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## PETITION FOR REVIEW

Pursuant to Section 21F of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-6(f), 17 C.F.R. § 240.21F-13, and Rule 15 of the Federal Rules of Appellate Procedure, Petitioner John Doe (Claimant #1), by and through counsel, hereby petitions this Honorable Court for review of the Final Order Determining Whistleblower Award Claims (Release No. 97202, File No. 2023-42) of the U.S. Securities and Exchange Commission dated March 27, 2023.

Accompanying this Petition is an Unopposed Motion to File Under Seal, seeking leave for Petitioner to proceed as John Doe (Claimant #1) and for an order providing for the filing under seal of any information that could tend to reveal Petitioner's identity.

A copy of the public Final Order (redacted) of which Petitioner seeks review is attached hereto as Exhibit A. A copy of the non-public Final Order (partially redacted) is included with the accompanying unopposed motion to seal.

Respectfully submitted,

/s/ *Brian J. Leske*
Brian J. Leske
Michael J. Sullivan
Kimberly P. West
ASHCROFT LAW FIRM LLC
200 State Street, 7th Floor
Boston, MA 02109
Phone: 617-573-9400
bleske@ashcroftlawfirm.com
msullivan@ashcroftlawfirm.com
kwest@ashcroftlawfirm.com

Counsel for Petitioner John Doe
(Claimant #1)

Dated: April 25, 2023

# TAB 3

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 23-1121**                    **September Term, 2022**

**SEC-2023-42**

**Filed On: May 12, 2023**

John Doe, (Claimant #1),

      Petitioner

    v.

Securities and Exchange Commission,

      Respondent

## O R D E R

Upon consideration of respondent's unopposed motion to transfer the case and for an administrative stay, it is

**ORDERED** that the motion to transfer be granted.  The Clerk is directed to transmit the original files, including a copy of this order, to the United States Court of Appeals for the Fifth Circuit.

                                        **FOR THE COURT:**
                                        Mark J. Langer, Clerk

               BY:    /s/
                         Laura M. Morgan
                         Deputy Clerk

# TAB 4

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No.: 1:12-cv-00033-JRN |
| | § | |
| LIFE PARTNERS HOLDINGS, INC., | § | *__HEARING REQUESTED__* |
| BRIAN PARDO, R. SCOTT PEDEN | § | |
| | § | |
| Defendants. | § | |

## OPPOSED EMERGENCY MOTION FOR APPOINTMENT OF RECEIVER

The Securities and Exchange Commission asks the Court to appoint a Receiver for Life Partners Holdings, Inc. and its affiliates (collectively, "LPHI"), and shows the following.

## I.
## SUMMARY OF REQUESTED RELIEF

On December 29, 2014, LPHI filed motions that make it clear that the company is financially unstable. Yet nothing has changed at the company in spite of the jury verdicts entered against it a year ago, a final judgment concluding that Defendants "deprived the investing public of information it needed," and sharply declining revenues. LPHI has not informed the public, on Form 8-K or otherwise, of the entry of the Final Judgment or its impact on the company, nor has it made any changes to its roster of officers and directors.

In order to protect investors and LPHI's creditors, including the Commission, the Court should appoint a Receiver to ensure that its current officers including Defendants Brian D. Pardo ("Pardo") and R. Scott Peden ("Peden), are unable to continue to waste assets and to ensure that LPHI is operated in compliance with the federal securities laws.  Pardo and Peden, along with LPHI's remaining officers and board members, continue to ignore the federal securities laws, as

discussed below.     Alternatively, the Court should appoint an independent Monitor to oversee

and assess LPHI's ongoing business operations, subject to periodic status reporting to this Court

## II.
## ARGUMENT AND AUTHORITY

A.     **LPHI** carries on business as usual despite dire financial conditions and the
impact of the Final Judgment on the company's sustainability.

The Court entered its Final Judgment based on Defendants "egregious" and "serious

violations" of the federal securities laws.  [Doc. 304, pp. 3, 4]  Defendants "knowingly – or at

least recklessly – violated the securities laws of this nation" and that "oversight and compliance

at Life Partners were non-existent." *Id.* Nevertheless, LPHI announced victory in materially

misleading press releases and Forms 8-K after trial, and Pardo continues to claim "we won" and

"the jury poured the SEC out on every legitimate claim they brought" in a book he recently

published about, among other things, this litigation. *See* Feb. 4, 2014 Form 8-K, attached hereto

as Exhibit A; March 14, 2014 Form 8-K, attached hereto as Exhibit B; Pardo, Brian D., *Junkyard*

*Dog*,  Hill Print Solutions, 2014, attached hereto in pertinent part as Exhibit C.

Apart from their self-serving press releases, Forms 8-K, and Pardo's version of events in

this case, Defendants remain conspicuously silent about the actual result and LPHI's current

financial condition.   Tellingly, LPHI has never disclosed, on Form 8-K or otherwise, the Final

Judgment, the Court's findings therein, or its impact on the company.[1]  Rather, LPHI's last

statement to the public on Form 8-K announced a quarterly dividend on September 2, 2014.

While LPHI continues to tout that it exists as a public company "purely to provide

 transparency for its life settlements clients," it is concealing basic information about the Final

---

[1] The Forms 8-K LPHI *has* filed with the Commission over the last 18 months routinely announce positive events in
litigation.  *See* http://ir.lphi.com /sec.cfm?DocType=Current&Year=]. It seems obvious that Defendants perceive the
Final Judgment to be a material event affecting LPHI and that selective disclosure of only positive litigation events –
and the decision not to file Form 8-K for the Final Judgment – reflects an ongoing effort to mislead the public.

Judgment and the company's sustainability, including requests to seal critical information about the possibility of bankruptcy and efforts to prevent enforcement of the judgment without posting any supersedeas bond. *See* http://ir.lphi.com/faq.cfm; *see generally* Doc. 314, 316, and 318.

While concealing key information from the public, LPHI continues to waste corporate assets through issuance of dividends. As Pardo testified at trial, LPHI has issued dividends every quarter since 2007. See 1-28-14pm Tr., p. 5; *see also* http://ir.lphi.com/dividends.cfm. LPHI paid out more than $68 million in dividends between February 2, 2002 and September 17, 2014 without missing a quarter. *See* http://ir.lphi.com/dividends.cfm. Since this case began, LPHI has issued nearly $15 million in dividends, including more than $2.7 million in three separate dividends issued *after* the jury returned its verdicts against Defendants. *Id.*

Importantly, Pardo admitted at trial that Pardo Family Holdings, Ltd. – the family trust he directs and which is located offshore in Gibraltar ("Pardo Trust") – owns more than half of LPHI's stock and, whenever LPHI issues dividends, the Pardo Trust receives more than half of the funds. *See* 1-28-14pm Tr., at p. 5.[2] Hence, the Pardo Trust has received more than $34 million since February 2, 2002 including $30 million since Mark Embry highlighted the issue of short LEs to Defendants in August 2008 [Ex. G-134], and $1.4 million since Defendants lost at trial. Equally troubling, LPHI failed to withhold taxes on dividends paid to the Pardo Trust in 2008, 2009, and 2010, as required by 26 U.S.C. § 1461.[3]

LPHI also continues to pay Pardo and Peden's sizeable salaries and bonuses,[4] though each of them claims extreme financial hardship and asks the Court to relieve them of their

---

[2] Pardo is the beneficial owner of the Pardo Trust which means he has "sole or shared power to vote or dispose of the stock." *See* http://www.nasdaq.com /investing/glossary/b/beneficial-owner. Pardo admitted at trial that Peden acted as the Pardo Trust's attorney-in-fact. *See* 1-28-14pm Tr., at pp. 8-9; Ex. G-435. He further admitted that he exercises the shareholder vote for the Pardo Trust, has authority to act for the Pardo Trust and has directed transactions of LPHI stock by the Pardo Trust. *See* 1-28-14pm Tr., at pp. 11-12, 13-14; Ex. G-209.

[3] http://files.shareholder.com/downloads/LPHI/3714485070x0xS1144204-14-61250/49534/filing.pdf , at p. 16

[4] Pardo was paid $667,261 in salary and bonuses in FY 2014 according to LPHI's July 2, 2014 Proxy Statement, which omits any reference to Peden's executive compensation. Peden was paid $204,528 in FY 2013.

obligation to pay the judgments, or post a bond securing the judgments, entered against them.[5]

Indeed, it is business as usual at LPHI regardless of the jury's verdicts, the Final Judgment, and the company's dire financial circumstances. Defendants have made no changes to LPHI's roster of officers and directors: Pardo is still CEO and Chairman of LPHI's Board of Directors, and Tad Ballantyne is still a Director and the Chairman of its Audit Committee.

Defendants have announced *one* key change in Life Partners' business model. On October 14, 2014, Pardo informed retail investors of their newly-created obligation to pay administrative policy maintenance fees in order to maintain their investment interests. *See* Letter of October 14, 2014, attached hereto as Exhibit D. In response to unrest among the thousands of retail investors due to the new fee, Pardo told *The Dallas Morning News* that, if investors fail to pay the fees, "we will sever them from the system and all communications with us as well." *See* Lieber, Dave, *Watchdog: Death Bet Investors Ambushed by Surprise Fees*, Dallas Morning News, November 22, 2014, attached hereto as Exhibit E. Thus, Defendants' retail investors face not only the possibility of LPHI's bankruptcy, but also a likelihood that LPHI will follow through on its clear threat to cut off investors' life settlement interests.

**B.    A RECEIVER IS NECESSARY TO PROTECT LPHI'S INVESTORS AND CREDITORS.**

**1.    Legal Standard for Appointment of Receiver**

Courts have broad discretion in ordering equitable relief in Commission actions, and "the appointment of a receiver is a well-established equitable remedy available to the [Commission] in [its] civil enforcement proceedings for injunctive relief." *SEC v. First Fin. Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981).[6] Courts will appoint a receiver where necessary to: (1)

---

[5] The Commission incorporates by reference its Response in Opposition to Defendants' Motions to Set Amount and Type of Security and for Alternate Security to Stay Enforcement of Final Judgment.
[6] Under Section 21(d)(5) of the Securities Exchange Act of 1934 ("Exchange Act") "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and

preserve the status quo while transactions are being unraveled in order to determine an accurate picture of a defendant's misconduct, *Id.*; (2) protect "those who have already been injured by a violator's actions from further despoliation of their property or rights," *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964); (3) prevent the dissipation of a defendant's assets pending further action by the court, *First Fin.*, 645 F.2d at 438; *see also SEC v. American Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987); or (4) install a responsible officer of the court who could bring the companies into compliance with the law, *Id.* at 437. An evidentiary hearing is not required where the record discloses sufficient facts to warrant such an appointment. *Bookout v. Atlas Fin. Corp.,* 395 F. Supp. 1338, 1342 (N.D. Ga. 1974), *aff'd sub nom. Bookout v. First Nat'l Mortgage & Disc. Co., Inc*., 514 F.2d 757 (5th Cir. 1975).

Proof of fraud is not required in order for a district court to exercise its broad discretion to appoint a Receiver. *See Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.,* 999 F.2d 314, 317 (8th Cir. 1993) (upholding appointment of receiver on motion of judgment creditor when it appeared that judgment debtor was hiding assets); *Citronelle-Mobile Gathering, Inc. v. Watkins,* 934 F.2d 1180, 1184 (11th Cir. 1991) (transfers to related entities and sending money out of the country); *Chase Manhattan Bank v. Turabo Shopping Ctr., Inc*., 683 F.2d 25, 26-27 (1st Cir. 1982) (evidence of unfair dealing); *New York Life Ins. Co. v. Watt West Inv. Corp*., 755 F. Supp. 287, 292-93 (E.D. Cal. 1991) (diversion of assets to pay unrelated obligations).

### 2. A Receiver is needed to maintain the status quo, to bring LPHI into compliance with the reporting requirements of the federal securities laws, to protect investors and creditors, and to prevent further dissipation of assets.

On December 29, 2014, Defendants each asked the Court to bar enforcement of the Final Judgment during their appeals without requiring them to post any supersedeas bond, arguing

---

any federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." *SEC v. First Financial Group of Texas*, 645 F.2d 429, 439 (5th Cir. 1981) (appointment of a receiver is a well-established equitable remedy available to the Commission in civil enforcement proceedings for injunctive relief).

financial hardship and the threat of bankruptcy.[7]  In their efforts to avoid paying the judgments –
or any bond securing the judgments on appeal – while continuing to operate LPHI, Defendants
essentially ask the Court to maintain the status quo for their benefit, even though it will unfairly
further harm LPHI's retail investors and creditors, including the Commission. Rather, the best
mechanism to maintain the status quo is the appointment of a Receiver.

LPHI's December 29, 2014 filing shows an imminent danger exists that it will continue
to deplete assets if immediate action is not taken to appoint a Receiver. Indeed, LPHI's own
public filings demonstrate a steady but sharp decline in LPHI's total and current assets:[8]

| Balance Sheet Date | Cash and Cash Equivalents | Total Current Assets |
|---|---|---|
| 2/28/11 | $27.6 million | $35.3 million |
| 2/29/12 | $11.4 million | $18.5 million |
| 2/28/13 | $7.5 million | $15.7 million |
| 2/28/14 | $6.1 million | $8.4 million |
| 8/31/14 | $3.06 million | $5.2 million |

Yet even during this time, LPHI declared and paid cash dividends of more than $25 million,
more than half of which went directly to the Pardo Trust.

Without a Receiver, it is likely that LPHI will cut off retail investors' interests as it has
expressly threatened to do.  And while LPHI contends that investors will be harmed in the event
of a bankruptcy, the Commission contends that investor interests – as well as the interests of
LPHI's creditors including the Commission – will be much better protected by a Court-appointed
Receiver or, if appropriate, a bankruptcy trustee.

Moreover, a Receiver is needed to bring LPHI into compliance with the Exchange Act's
reporting requirements including, but not limited to, announcing material events on Form 8-K,

---

[7] As the Commission establishes in its response to Defendants' Motions to Set Security and for Alternate Security to
Stay Enforcement of Final Judgment, any financial hardship at LPHI is self-inflicted.
[8] *See* LPHI's Forms 10-K for FYs 2011—2014, http://ir.lphi.com/sec.cfm?DocType=Annual&Year= , and October
15, 2014 Form 10-Q for the period ended August 31, 2014, http://ir.lphi.com/sec.cfm?DocType=Quarterly&Year=.

and to prevent further violations of the Securities Act and the Exchange Act.[9]

As a last resort, LPHI is "willing to accept" what it considers "reasonable financial restrictions" to stay enforcement of the Final Judgment during their appeal. [Doc. 319, p. 20]. But the restrictions LPHI proposes are insufficient to protect investors or the Commission's Final Judgment and, instead, highlight a total disregard of the jury's verdicts and the Final Judgment and only confirm that the independent oversight of a Receiver is necessary. For instance, LPHI claims it is only capable of depositing $250,000 in cash with the Court, but reserves the right to freely transfer assets up to $500,000 as it wishes and then only to limit transfers of assets exceeding $500,000 to its "ordinary course of business."[10] LPHI's ordinary course of business, however, includes a longstanding pattern of wrongdoing that includes misleading shareholders and retail investors and failing to disclose necessary information to the investing public. Thus, for all of these reasons, the Commission asks the Court to appoint a Receiver over LPHI and its affiliates, including Life Partners, Inc. Further, given the company's financial condition, the Commission believes in this instance that it would be prudent to direct the appointed Receiver to conduct an immediate analysis of the companies and make a recommendation to the Court, within 30 days of appointment, as to whether the initiation of bankruptcy proceedings under Chapter 7 or 11 of the Bankruptcy Code, would be appropriate such that creditor claims against the entities would be adjudged in a bankruptcy court.

---

[9] The Commission contends LPHI should have announced as material events on Form 8-K the Final Judgment on as well as, among other things, the impact of the judgment, the findings made about LPHI's lack of compliance and Tad Ballantyne's ineffective directorship, and the company's apparent or imminent insolvency and possible bankruptcy. LPHI's 10-Q for the period ended November 30, 2014 is due January 15, 2015.

[10] LPHI relies on *Miami Int'l Realty v. Paynter*, 807 F.2d 871, 872-874 (10th Cir. 1986), a case that is factually distinct from this action. There, defendant could not post a full bond but nevertheless provided value equal to approximately 25% of the judgment against him and was enjoined from transferring all but mere cost-of-living or occupational expenses. Here, LPHI essentially asks the Court to waive its bond requirement when it proposes a cash deposit of $250,000 – 0.65% of the $38 million judgment against it.

D.     **A HIGHLY QUALIFIED RECEIVER CANDIDATE IS PREPARED TO ACT IMMEDIATELY.**

The Commission recognizes that the selection of a Receiver of course lies within the Court's discretion.  But, given the exigent circumstances, the Commission vetted several qualified candidates who: (i) possess superior skill and experience serving as court-appointed Receivers; (ii) agree to standard billing and reporting requirements; (iii) agree to reduce their professional fees; (iv) have personnel and counsel poised for immediate action; and (v) have cleared conflicts.

The Commission recommends appointment of H. Thomas ("Tom") Moran II as Receiver. Mr. Moran is the Chief Executive Officer of Asset Servicing Group ("ASG"), located in Oklahoma City, Oklahoma.  *See* Exhibit F.  ASG is a market leader in the life settlement industry focused on servicing life insurance policies and portfolios of policies for a wide variety of clients and is a member of key industry organizations including the Institutional Life Markets Association ("ILMA") and the Life Insurance Settlement Association ("LISA").  *Id.*  Mr. Moran's work focuses specifically on the asset settlement industry.  *Id.*

Mr. Moran has extensive experience serving as a court-appointed Receiver, as well as assisting other Receivers, most relevantly in *State of Texas v. Retirement Value, LLC, et al.,* a 2010 action in which a Texas court concluded that Retirement Value – a New Braunfels, Texas life settlements company – lied to life settlement purchasers about the validity of its life expectancies, qualifications of its life expectancy provider, and historical performance.  *See http://www.rvllcreceivership.com/.*  In connection with the *Retirement Value* Receivership, Moran and ASG: (1) act as portfolio managers; (2) advise the Receiver as to insurance policies' value and viability; (3) provide critical industry and asset management experience including: obtaining updated health information and life expectancies for insureds, death tracking, claims

processing, policy verification and valuation, and premium optimization. *See* Exhibit G, Receiver's Thirteenth Motion for Approval of Payment of Professionals.

For these reasons, the Commission respectfully submits that Mr. Moran is uniquely qualified to oversee LPHI as this Court's Receiver. Most importantly, he possesses significant experience evaluating, valuing, and managing life settlement assets, which positions him to protect the interests of LPHI's retail life settlement investors – the same investors the company has threatened to cut off.[11] For the Court's convenience, we have submitted with this Motion a proposed order appointing Mr. Moran as Receiver. Alternatively, the Commission stands ready to assist the Court in identifying another qualified candidate should the Court so desire.

### E.    ALTERNATIVELY, THE COURT SHOULD APPOINT A MONITOR TO OVERSEE AND APPROVE ALL LPHI FINANCIAL TRANSACTIONS.

If the Court elects not to appoint a Receiver to protect the interests of LPHI's investors and to prevent dissipation of assets, the Commission asks the Court to appoint a Monitor to oversee LPHI and its affiliates and report activities that are inconsistent with the company's obligations to its investors and creditors. A Court-appointed monitor will provide an independent resource to observe LPHI's operations, advise the company on how to comply with the law, and report observations and recommendations to the Court.

### F.    IF THE COURT WILL NOT APPOINT AN EQUITABLE RECEIVER OR MONITOR, IT SHOULD APPOINT A RECEIVER UNDER THE TEXAS TURNOVER STATUTE.

Defendants' deadline to pay the amounts ordered in the Final Judgment expired on December 30, 2014. Defendants are in contempt of the Court's order, and their assets available

---

[11] In its post-judgment motions, LPHI fails to inform the Court that it announced a new policy in October 2014, requiring retail life settlement purchasers to immediately begin paying administrative fees associated with monitoring insurance policies until the time of insureds' deaths, resulting in newly filed lawsuits against the company and the company's threat – quoted in *The Dallas Morning News* – that, if investors fail to pay the newly required fees, "we will sever them from the system and all communications with us as well."

to satisfy the Final Judgment are at risk of further loss.[12]

As a judgment creditor, the Commission is entitled to appointment of a Receiver to aid execution, pursuant to TEX. CIV. PRAC. & REM. CODE §31.002(a) and (b)(3), made applicable to these proceedings by FED. R. CIV. P. 69(a). Section 31.002 provides in pertinent part:

(a)    A judgment creditor is entitled to aid from a court of appropriate jurisdiction through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that:

    (1)    cannot readily be attached or levied on by ordinary legal process; and

    (2)    is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.

(b)    The court may: . . .

    (3)    appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment.

Federal courts in Texas have construed the turnover statute to authorize appointment of receivers over judgment debtors and their property to aid the execution of final judgments. *See, e.g., United States v. Messervey,* 182 Fed. Appx. 318, 321 (5th Cir. 2006);[13] *Santibanez v. McMahon & Co.,* 105 F.3d 234, 241 (5th Cir. 1997); *RTC v. Smith,* 53 F.3d 72, 77 (5th Cir. 1995); *World Fuel Services Corp. v. Moorehead,* 229 F. Supp. 2d 584, 589 (N.D. Tex. 2002).

---

[12] A district court has continuing jurisdiction in support of its judgment, and until the judgment has been properly stayed or superseded, the district court may enforce it through contempt sanctions. *See Santibanez v. Wier McMahon & Co.,* 105 F.3d 234 (5th Cir. 1997); *R.T.C. v. Smith,* 53 F.3d 72, 76 (5th Cir. 1995); *Alberti v. Klevenhagen,* 46 F.3d 1347, 1358 (5th Cir.1995); *United States v. Revie,* 834 F.2d 1198, 1205 (5th Cir.1987), *cert. denied,* 487 U.S. 1205, 108 S. Ct. 2845, 101 L. Ed. 2d 882 (1988)))(internal quotations omitted).

[13] Relevantly, the Fifth Circuit rejected a claim by the defendant in *Messervey* that property seized under the turnover order belonged to a "trust created by him  . . . and thus was not subjected to" the court's turnover order. *Messervey,* 182 Fed. Appx. at 321. The Court held that "[t]he issue whether the seized property was transferred to a trust was never ruled upon by the district court . . . [and] because the district court could not have resolved whether the property was part of a trust, this claim does not survive plain error review." *Id.*

**III.**
**<u>CONCLUSION</u>**

The Commission requests emergency appointment of an equitable Receiver over LPHI and recommends that H. Thomas Moran, II be considered to serve in that capacity. Alternatively, the Commission requests appointment of a Court-appointed Monitor over LPHI. Finally, in the further alternative, the Commission respectfully requests appointment of a statutory turnover Receiver in accordance with TEX. CIV. PRAC. REM. CODE § 31.002.

Dated: January 5, 2015

Respectfully submitted,

*/s/ Jessica B. Magee*
Jessica B. Magee
Texas Bar No. 24037757
Matthew J. Gulde
Illinois Bar No. 6272325
B. David Fraser
Texas Bar No. 24012654
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6465 (JBM)
(817) 978-4927 (fax)
*MageeJ@sec.gov*
Attorneys for Plaintiff Securities and
Exchange Commission

# TAB 5

United States Department of Justice
Office of the United States Trustee
1100 Commerce Street
Dallas, Texas 75242
(214) 767-1080

Lisa L. Lambert,
For the United States Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| In re: | § |
| | § **Chapter 11 Case** |
| | § |
| **LIFE PARTNERS HOLDINGS, INC.,** | § **Case No. 15-40289-rfn-11** |
| | § |
| | § **Hearing Date: Jan. 26, 2015 at 2:30 pm** |
| **Debtor.** | § |

## UNITED STATES TRUSTEE'S MOTION FOR AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

**TO THE HONORABLE RUSSELL F. NELMS,**
**UNITED STATES BANKRUPTCY JUDGE:**

The United States Trustee for Region 6 moves for an order directing the appointment of a

Chapter 11 Trustee based on cause and the best interests of the creditors. *11 U.S.C. § 1104(a).*

The United States Trustee would show:

### <u>Overview</u>

The United States District Court has entered a judgment finding that the Debtor's

management has repeatedly violated securities laws and has attempted to constrain its

independent auditors.  The board of directors and its audit committee ignored their fiduciary

responsibilities to monitor audit issues and remedy them.  While SEC allegations were pending

against the Debtor and even after the jury rendered an adverse judgment, the Debtor continued to

make large dividend payments, and these payments benefitted the 51% stockholder, a trust controlled by Pardo, the Debtor's chief executive officer who has repeatedly violated securities laws.  In an examiner motion, the Debtor has put the interest of creditors and other parties in interest in issue, 11 U.S.C. §1104(a)(2).  In addition, "cause" exists to appoint a trustee.  11 U.S.C. §1104(a)(1).  The motion to appoint an examiner with expanded powers should be denied, and a trustee should be appointed.

## Jurisdiction

1.      The Court has subject matter jurisdiction under 28 U.S.C. § 1334, 28 U.S.C. § 157(a)(1), and the standing order of reference.  Appointing a trustee or examiner impacts the case administration and therefore is a core matter that the Court has the power to resolve.  28 U.S.C. § 157(b)(2)(A).

2.      The United States trustee has standing to seek appointment of a trustee or examiner.  11 U.S.C. §§ 307, 1104.

## Facts

3.       In this case, the same facts are relevant when evaluating whether a trustee or examiner should be appointed, so the United States Trustee alleges the same facts here as in his Objection to Debtor's Examiner Motion.

4.      Life Partners Holding, Inc. (Debtor) is the parent company of Life Partners Inc. (LPI).  A question exists about veil piercing.  In SEC v. Life Partners Holding, Brian Pardo, and R. Scott Peden, the United States District Court found that the Debtor "and LPI effectively operate as a single entity."  *"SEC Judgment," p. 10; ECF No. 304 in 12-cv-33, United States District Court for the Western District of Texas*

5.      On Tuesday, January 20, 2015, the Debtor filed a voluntary petition under chapter 11 of

the Bankruptcy Code.  The Debtor listed 68 parties in its matrix, approximately $20 million in

assets, and $7,411,235 in liabilities.  In a footnote, the Debtor indicates the liabilities are based

on SEC filings made before the federal district court entered a judgment requiring the Debtor to

disgorge $15 million and pay a $23 million penalty to the SEC.  *Petition, ECF No. 1, Bankr. No.

15-40289.*

6.      The petition is signed by Brian D. Pardo ("Pardo"), the president and chief executive

officer of the debtor.

7.      The petition discloses that only one party holds more than five percent of the Debtor's

stock: Pardo Family Holdings Limited (PFHL).  In the December 2, 2014 SEC Judgment, the

Court found that Pardo or PFHL owns 51% of the Debtor's stock.  *SEC Judgment, p. 4. n. 7.*

8.      The United States Trustee solicited a committee and set the formation meeting for

Thursday, January 29, 2015.   In broad overview, the SEC alleges that the retail investors

purchased life insurance policies using erroneous actuarial data, so the retail investors are not

collecting funds.  The SEC Judgment notes that the *Wall Street Journal* reported policy holders

were living two and three times beyond projections.  *SEC Judgment, pp. 5-6, n. 2.*  The SEC

Judgment emphasizes that the retail investors, those who purchased life insurance policies as

opposed to public investors, could be the primary victims of faulty disclosures.  *SEC Judgment,

p. 10.* These retail investors are not listed in the list of twenty largest creditors, but they may be

included on the matrix, and the United States Trustee has discovered some pending litigation.

The United States Trustee is attempting to reach these retail investors so they can inform the

United States Trustee whether they believe they have standing to participate on a committee.

*The Bankruptcy Filing Results from SEC Judgment and Receivership Motion:*

9.      Before the bankruptcy filing, a jury returned a verdict in favor of the SEC.  On December

2, 2014, the United States District Court entered a judgment requiring the Debtor to disgorge $15

million and pay $23.7 million in civil penalties.  *SEC Judgment, p. 20* .

10.     The SEC sought appointment of a receiver, and that motion was set for hearing the day

after the bankruptcy filing.  The matter was abated so this Court could consider the scope of the

automatic stay.

11.     The Debtor's press release acknowledges that the bankruptcy filing resulted from the

desire      to      appeal      the      judgment      and      avoid      a      receiver.

*http://ir.lphi.com/releasedetail.cfm?ReleaseID=892086, Exhibit G to SEC Motion to Appoint a*

*Trustee.*

*SEC Judgment Contains Findings Relevant to Examiner or Trustee Issues:*

12.     Summarizing the SEC Judgment as to the Debtor, the following findings are relevant:

   a.   Pardo threatened Ernst & Young, the independent auditors, with suit if they did not

        approve the Debtor's accounting, and Pardo did not investigate the auditor's findings,

        *SEC Judgment, p. 4*;

   b.   Pardo agreed to a permanent injunction against violating section 13 in 1991, *SEC*

        *Judgment, p. 4;*

   c.   In 2007, Colorado obtained an agreed judgment about securities violations, and the

        Debtor and LPI were ousted from Colorado, *SEC Judgment, pp. 4-5;*

   d.   Despite this history, Pardo did not increase vigilance regarding securities law

        compliance; "He is a repeat offender who shows no signs that he has learned his

        lesson;" *SEC Judgment, pp. 5, 14.*

e.   The Debtor committed securities fraud but not during the specific time period that the SEC alleged, *SEC Judgment, p. 4 n. 1.*

f.   Pardo received escalated civil penalties for providing, "knowing and substantial assistance in LPHI's filing of seventeen separate, false reports, and his knowingly false certifications thereof, as discrete violations of five separate provisions of the Exchange Act: Section 13(a), Rule 12b-20, Rule 13a-1, Rule 13a-13, and Rule 13a-14, for a total of 85 individual violations."

g.   Ballantyne, a member of the board of directors as well as the audit committee, did not monitor financial publications and testified he was unaware of (i) a *Wall Street Journal* article questioning whether the Debtor was systematically defrauding retail investors, (ii) the public auditors requiring Pardo to retract statements, *SEC Judgment, pp. 5-6.*

***Public Filings Contain Information Relevant to Appointment of Trustee or Examiner:***

13.     According to the website, Pardo, Peden, and Ballantyne remain three of the Debtor's five directors.  http://ir.lphi.com/directors.cfm.

14.     Pardo remains chief executive officer.  Peden remains general counsel and secretary. Peen is listed as president, but Pardo signed the petition as president. http://ir.lphi.com/management.cfm.

15.     PFHI, Pardo's offshore family trust, received $12.5 million between February 2011 and August 2014.  The SEC alleges an additional $1.4 million has been distributed since the jury verdict.  *See Jury Verdict, dated February 2, 2014, ECF No. 258 in SEC Action; quarterly dividend press release dated September 15, 2014, providing for $.05 dividend on September 17, 2014,http://ir.lphi.com/releasedetail.cfm?ReleaseID=868660; 10-Q for unaudited nine months*

ending November 30, 2014, reflecting 2014 dividend of 2,797,236 and 2013 dividend of
$3,729,569.  (As 51% equity holder, PFHI would have received half of each dividend.)

### Legal Analysis and Argument

30.    The United States Trustee is charged with monitoring the federal bankruptcy
system. *See* 28 U.S.C. § 586(a)(3),  *See also United States Trustee v. Columbia Gas Sys., Inc.* (*In
re Columbia Gas Sys., Inc.*) 33 F.3d 294, 295-96 (3d Cir. 1994).

31.    Before confirmation, the Court "shall order the appointment of a trustee . . . for
cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the
debtor by current management, either before or after the commencement of the case, or similar
cause." 11 U.S.C. §1104(a)(1).   In addition, by adding appointment of a trustee as a remedy in
section 1112, "cause" also may be factors traditionally resulting in dismissal or conversion.  11
U.S.C. §1112(b)(1).  Here, appointing a trustee is in the interest of creditors because the filing is
in bad faith.  Alternatively, the Court must appoint a trustee "if such appointment is in the
interest of the creditors, any equity security holders, and other interests of the estate."  11 U.S.C.
§ 1104(a)(2).

32.    The Fifth Circuit has indicated that the burden of proof for appointment of a
trustee is "clear and convincing" evidence, but the Court later adopted the dissent's opinion.
*Cajun Elec. Co. v. Louisiana Elec. Co.* (*In re Cajun Electric Power Co-Op, Inc.*), 69 F.3d 746,
*on reh'g*, 74 F.3d 599 (5th Cir. 1996) (adopting dissent).[1]

33.    The duties of a trustee are defined in section 1106, and the Court has the ability to
tailor some of them.  11 U.S.C. § 1106(a).

---

[1]  In *Grogan v. Garner*, the United States Supreme Court held that the burden of proof for dischargeability fraud
actions was preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 291 (1991).  In reaching this holding,
the Supreme Court cataloged both bankruptcy and non-bankruptcy fraud statutes and held that Congress generally
imposed a preponderance standard for fraud in civil proceedings.

34.    The "cause" to appoint an examiner or a trustee may be a reason other than the enumerated factors. *Oklahoma Ref. Co. v. Blaik (In re Oklahoma Ref. Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *cf. Little Creek Dev. Corp. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Corp.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (defining "cause" in context of dismissal statute).

35.    For example, courts have appointed trustees or examiners when the debtor's insiders have conflicts of interest arising from the sale of the Debtor's assets.  In *Cajun Electric*, the Fifth Circuit affirmed the appointment of a trustee, in part, because the co-operative members were interested in purchasing part or all of Cajun Electric's assets.  *Cajun Elec. Power Cooperative, Inc. v. Central Louisiana Elec. Co., Inc. (In re Cajun Elec. Power Cooperative, Inc.)*, 69 F.3d 746, 751 (5th Cir. 1995) (Garza, J., dissenting), *adopted as majority opinion on reh'g*, 74 F.3d 599 (5th Cir. 1996).  The Fifth Circuit held that "a trustee may be the only effective way to pursue reorganization" when the management has cross-purposes. *Cajun Elec.*, 69 F.2d at 751.

### *Cause exists to appoint a chapter 11 trustee:*

36.    Here, both express statutory standards and the common law case standards for "cause" exist.  Specifically, "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor" and bad faith exist under the facts of this case.[2]

37.    While the Debtor was not found guilty of securities fraud, the District Court emphasized that the evidence reflected that the Debtor was guilty of securities fraud but not during the time periods alleged by the SEC.  *SEC Judgment, p. 4, n. 1.*

---

[2]  "The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive officer . . . participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting."  11 U.S.C. §1104(e).

38.     The District Court specified that the Pardo, the Debtor's chief executive officer, has had a history of both federal and state securities violations since 1991 and that he has behaved recklessly.  *SEC Judgment, pp. 14-15.*

39.     The record regarding the lack of oversight by the board of directors and audit committee reflects both incompetence and gross mismanagement.  *SEC Judgment, pp. 5-7.*

40.     Other "cause" exists to appoint a trustee because the management has conflicts of interest in assessment of tort actions and avoidance actions against the insiders.

*It is in the best interests of creditors to appoint a chapter 11 trustee.*

41.     Appointment of chapter 11 trustee is also in the interests of creditors, equity security holders, and other interests of the estate.  The Court should direct the appointment of a chapter 11 trustee to serve the "interests of creditors, any equity security holders, and other interests of the estate."  11 U.S.C. §1104(a)(2).

42.     First, it is in the best interest of the creditors to have an independent trustee to assume control over the estate in order to evaluate any alter ego claims, avoidance actions, and other tort claims.

43.     Second, it is in the best interest of the creditors and other parties-in-interest to have accurate financial information.  Accurate financial information insures parties understand the facts of the case and avoids post-petition liabilities for violations.  Like the information provided to investors in securities filings, the information provided in a bankruptcy case depends on affirmative disclosure.  On a lengthy history of decades of non-compliance by the chief executive officer and a record of lack of oversight by the board of directors, a trustee serves the best interests of creditors and non-insider investors.

For the foregoing reasons, the United States Trustee requests the Court to

(1) order the United States Trustee to appoint a Chapter 11 Trustee; or

(2) grant to the United States Trustee such other and further relief as is just and

proper.

Dated: January 26, 2015

Respectfully Submitted,
WILLIAM T. NEARY
UNITED STATES TRUSTEE

*/s/Lisa L. Lambert*
Lisa L. Lambert
Assistant U.S. Trustee, TX 11844250
Office of the United States Trustee
1100 Commerce St.  Room 976
Dallas, Texas  75242
(214) 767-1080

## Certificate of Service

I certify that I sent copies of the foregoing document on January 26, 2015, to the attached
service lists by first class United States mail and by ECF notification to those listed below.

*/s/  Lisa L. Lambert*
Lisa L. Lambert

J. David Dickson
Beard Kultgen Brophy Bostwick Dickson
220 South 4th Street
Waco TX 76701
Dickson@thetexasfirm.com

Laurie Spindler Huffman
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons, Ste 1000
Dallas TX 75207
Laurie.Spindler@publicans.com

Jessica B. Magee
U.S. Securities and Exchange Commission
801 Cherry Street, Unit 18, Suite 1900
Fort Worth TX 76102
mageej@sec.gov

J. Robert Forshey
Forshey & Prostok, LLP
777 Main St., Suite 1290
Ft. Worth TX 76102
jrf@forsheyprostok.com

Jeff P. Prostok
Forshey & Prostok, LLP
777 Main St., Suite 1290
Ft. Worth TX 76102
jpp@forsheyprostok.com

Rod L. Poirot
Cavazos Hendricks Poirot & Smitham, P.C.
900 Jackson St., Suite 570,
Dallas TX 75202
rpoirot@chfirm.com

# TAB 6

David M. Bennett
Texas Bar No. 02139600
Richard Roper
Texas Bar No. 17233700
Katharine Clark
Texas Bar No. 24046712
THOMPSON & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (Facsimile)
David.Bennett@tklaw.com
Richard.Roper@tklaw.com
Katie.Clark@tklaw.com

**(PROPOSED) ATTORNEYS FOR THE**
**CHAPTER 11 TRUSTEE, H. THOMAS MORAN II**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 15-40289-RFN-11** |
| **LIFE PARTNERS HOLDINGS, INC.,** | § | |
| | § | **CHAPTER 11** |
| DEBTOR | § | |

## TRUSTEE'S EMERGENCY MOTION TO AMEND
## THE GOVERNING DOCUMENTS AND TO FILE VOLUNTARY
## <u>CHAPTER 11 PETITIONS FOR DEBTOR'S SUBSIDIARIES</u>

# TABLE OF CONTENTS

I.     JURISDICTION AND VENUE ......................................................................1

II.    BACKGROUND ...........................................................................................2

       A.    Procedural Background..................................................................... 2

       B.    Debtor's Business ............................................................................. 3

       C.    The SEC Action ............................................................................... 5

       D.    Significant Litigation Pending Against LPHI, LPI and/or LPIFS ......... 6

III.   ARGUMENT AND AUTHORITIES.................................................................7

       A.    Amending the Governing Documents of LPI and LPIFS is Appropriate to
             Allow the Trustee to Adequately Exercise his Powers........................... 8

       B.    LPI and LPIFS Bankruptcy Cases Will Facilitate the Discharge of the
             Trustee's Fiduciary Responsibilities to All Stakeholders...................... 8

IV.    CONCLUSION............................................................................................12

# TABLE OF AUTHORITIES

## CASES

*In re American Way Serv. Corp.,*
229 B.R. 496 (Bankr. S.D. Fla. 1999) ............................................................... 9

*In re Cano,*
410 B.R. 506 (S.D. Tex. 2009) ......................................................................... 8

*In re Consolidated Auto Recyclers, Inc.,*
123 B.R. 130 (Bankr. D. Maine 1991)................................................. 9, 10, 12

*In re GGW Brands, LLC*
(C.D. Cal. May 20, 2013) .................................................................................. 9

*In re John Hicks Chrysler-Plymouth, Inc.,*
152 B.R. 503 (Bankr. E.D. Tenn. 1992) ............................................................ 9

*In re Porter McLeod, Inc.,*
231 B.R. 786 (D. Col. 1999).............................................................................. 9

*Matter of Mendoza,*
111 F.3d 1264 (5th Cir. 1997) ........................................................................... 7

*Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.),*
314 F.3d 1070 (9th Cir. 2002) ......................................................................... 11

## STATUTORY AUTHORITIES

11 U.S.C. § 105 ................................................................................................... 7
11 U.S.C. § 363 ........................................................................................... 1, 7, 9
11 U.S.C. § 1104................................................................................................... 2
11 U.S.C. § 1106............................................................................................... 1, 8
11 U.S.C. § 1108........................................................................................... 1, 8, 9
28 U.S.C. § 157 ................................................................................................... 1
28 U.S.C. § 1334 ................................................................................................. 1
28 U.S.C. § 1408 ................................................................................................. 1
28 U.S.C. § 1409 ................................................................................................. 1

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, the Chapter 11 Trustee, H. Thomas Moran II, (the "Trustee") for the bankruptcy estate of Life Partners Holdings, Inc. ("LPHI" or the "Debtor") and files this Emergency Motion to Amend the Governing Documents and to File Voluntary Chapter 11 Petitions for Debtor's Subsidiaries (the "Motion"), pursuant to which the Trustee respectfully requests entry of an order authorizing him (i) to amend the governing documents of the Debtor's wholly owned operating subsidiary Life Partners, Inc. ("LPI") and LPI's wholly owned subsidiary, LPI Financial Services, Inc. ("LPIFS"), and (ii) to file voluntary chapter 11 bankruptcy petitions for LPI and LPIFS.  In support thereof the Trustee respectfully states the following:

## I.    JURISDICTION AND VENUE

1.     This Court has jurisdiction over the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case") of LPHI and this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Bankruptcy Case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     The legal predicates for the relief sought herein are sections 1106, 1108, 363 and 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code").  This Motion is also based on the exhibits attached thereto, the record in this case, the arguments and representations of counsel, any other evidence that may be presented at or prior to the hearing on Motion, and all other matters of which the Court may properly take judicial notice.

## II.   **BACKGROUND**

**A.     Procedural Background**

3.      On January 20, 2015 ("Petition Date"), the Debtor filed with this Court its voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby initiating its Bankruptcy Case.

4.      Following the Petition Date, the Debtor remained in control of its business and affairs as debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.  However, shortly after the Petition Date, the Securities and Exchange Commission filed its *Motion Under 11 U.S.C. § 1104(a) for Appointment of a Chapter 11 Trustee*.  Dkt. No. 14.  On January 26, 2015, the United States Trustee (the "UST") filed the *UST's Motion for an Order Directing the Appointment of a Chapter 11 Trustee*.  Dkt. No. 27.  An Official Committee of Unsecured Creditors (the "Committee") was appointed on January 30, 2015, and the Committee joined the motions of the SEC and UST to appoint a chapter 11 Trustee.

5.      The SEC brought its motion, in part, because of a judgment it had recently obtained in the matter of *SEC v. Life Partners Holdings, Inc., et al.*, pending in the federal district court for the Western District of Texas, Case No. 12-cv-00033-JRN (the "SEC Action") against LPHI for violation of federal securities laws, and its concerns of continued wrongdoing as a result of the same practices and mismanagement that had led to the entry of a judgment against the company in the SEC Action.  *See, e.g.*, Dkt. No. 14, at p. 3–5 and Exhibit A to the SEC Motion.

6.      On March 10, 2015, following six nonconsecutive days of hearings on the Trustee motions,[1] the Court entered its Order granting the SEC's motion.[2]  Dkt. No. 186.  On Friday,

---

[1] The hearing began on February 6, 2015 and concluded on February 19, 2015.

March 13, 2015, the UST gave notice of its appointment of Mr. Moran as the chapter 11 Trustee, and this Court approved the UST's application for appointment [Dkt No. 206] on Friday, March 20, 2015.  Dkt. No. 229.

**B.    Debtor's Business**

7.    Since the appointment of the Trustee, the Debtor's business has continued to operate under the direction of the Trustee.  The Debtor is a publically traded company incorporated in Texas and its common stock is listed on the NASDAQ Global Select under the trading symbol "LPHI."  *See* Form 10-K, LPHI (Feb. 28, 2014), attached hereto as Exhibit A. LPHI is a holding company and is the parent company, by virtue of being the 100% stock owner, of LPI, which is not in bankruptcy.

8.    LPI, among other things, is engaged in the secondary market for life insurance known generally as "life settlements."  LPI was incorporated in 1991 and has conducted business under the registered service mark "Life Partners" since 1992.  *See* Exhibit A.  LPI asserts that its business is facilitating the sale and administration of life settlements.  *See Opposed Emergency Motion by Defendant Life Partners Holdings, Inc. to Set Amount of Security and for Alternate Security to Stay of Enforcement of Judgment Pending Appeal*, Dkt. No. 319, SEC Action, at p. 17, attached hereto as Exhibit B.  LPI employs more than 50 employees and conducts the day-to-day operations of the life settlement business.  *See* Exhibit B, at p. 13 and Affidavit of Colette Pieper to Exhibit B, at ¶ 7.

9.    LPI has asserted that its business model is to derive fees from facilitating transactions whereby it identifies, examines, and purchases life insurance policies as agent for third parties.  According to LPI, the existing policyholder receives an immediate cash payment.

---

[2] On March 10, 2015, the Court denied the UST's motion to appoint a trustee as moot.  Dkt. No. 188.

LPI also asserts that, through such transactions, insureds are able to monetize their interests in such policies, which may be spread into fractional 'interests' among purchasers (either individual or institutional). Dkt. No. 6, at ¶ 8.

10.    Beginning in the third quarter of 2014, LPHI and LPI created a new subsidiary of LPI, LPIFS, for the stated purpose of billing LPI's life settlement customers for ministerial services in order to recover the expenses of tracking, coordinating, and reconciling policy premium payments and maturity payouts through the life settlement process. *See* Form 10-Q, LPHI (Nov. 30, 2014), attached hereto as Exhibit C. LPIFS recorded payments of $4,399,591 during the Third Quarter for such ministerial fees. *Id.*

11.    LPHI, LPI, and LPIFS operate at the same address in Waco, Texas. *See, e.g.,* Dkt. No. 14, at Exhibit T to the SEC Motion, at p. 4–5. In addition, LPI and LPHI file consolidated financial statements, and LPHI reports on LPI's litigation in its annual reports. *Id.* at Exhibit T to the SEC Motion, at p. 4.

12.    The court in the SEC Action found: "LPI's business *is* LPHI's business, as well as the source of its revenues." Dkt. No. 14, at Exhibit T to the SEC Motion, at p. 5. In other words, LPHI and its subsidiaries operate as a single business enterprise, with LPHI as the holding company, LPI as LPHI's operating subsidiary, and LPIFS as LPI's subsidiary. In fact, other than its ownership of all of LPI's stock, LPHI has no ongoing business separate and apart from the ongoing business of LPI and LPIFS. *See* Dkt Nos. 180, 190, 191, and 192.

C.     **The SEC Action**

13.     Prior to the Petition Date, the Debtor was involved in two years of litigation in the SEC action, which the SEC brought against it and two[3] of its officers, Brian Pardo[4] and Scott Peden, by the SEC alleging multiple counts of securities laws violations. *See, e.g., Complaint*, Dkt No. 1, SEC Action, attached hereto as Exhibit D.

14.     In February 2014, a jury found in favor of the SEC on several of the counts, and on December 2, 2014, the Honorable James R. Nowlin entered his *Final Judgment Order* confirming certain of the findings of the jury. Dkt. No. 14, at Exhibit A to the SEC Motion.

15.     The Debtor was ordered to pay $15 million in disgorgement and $23.7 million in civil penalties. Dkt No. 14, at p. 5. LPHI admitted in a press release that it filed for bankruptcy protection as an end-run around the District Court's jurisdiction to avoid the appointment of a receiver, stating "[t]he Securities and Exchange Commission had filed a motion with the Federal trial court to appoint a receiver for the Company. Faced with this possibility and having received no other protection requested from the Federal trial court, the Company elected to seek protection under Chapter 11 in order to avoid the appointment of a receiver." *Id.* at p. 4 and Exhibit G to the SEC Motion.

16.     Though the SEC judgment does not name LPI , Scott Peden, LPI's current general counsel, stated in a sworn affidavit filed in the SEC Action that "[t]he enterprise value of LPI and LPIFS has the potential to generate revenue that could ultimately be used by LPHI (as LPI's parent company) to pay any final judgment in the future." Exhibit B, at Affidavit of Scott Peden.

---

[3] The SEC also brought claims against David Martin, the (former) Chief Financial Officer for LPHI. *See* Exhibit D. David Martin consented to a Final Judgment prior to trial on January 9, 2014. *See, Final Judgment as to Defendant David M. Martin*, Dkt. No. 201, SEC Action, attached hereto as Exhibit E.

[4] Mr. Pardo, through Pardo Family Holdings Limited, also owns approximately 51% of the stock in LPHI. *See* Dkt. No. 2; Dkt. No. 181, at p. 8–9.

**TRUSTEE'S EMERGENCY MOTION TO AMEND**                                    **PAGE 5**
**THE GOVERNING DOCUMENTS AND FILE VOLUNTARY**
**CHAPTER 11 PETITIONS FOR SUBSIDIARIES**
522202 000002 14489653.12

17.    Moreover, even after the jury found that Mr. Pardo and Mr. Peden committed fraud in violation of Section 17(a)(1) of the Securities Act of 1933 and Section 13(a) of the Securities and Exchange Act of 1934, the boards of directors for LPHI and LPI retained Mr. Pardo as a consultant and Mr. Peden as the LPI's general counsel.  *See* Dkt. No. 14, at Exhibit A to the SEC Motion, at p. 1, 3.    Similarly, the boards of directors have not changed in composition, despite the serious doubt of the court in the SEC Action of the credibility of the board.  *Id.* at Exhibit A to the SEC Motion, at p. 7 ("[Mr. Ballantyne] *remains on the Board.* This is not altogether surprising.  No one—not Pardo, not Peden, not the members of LPHI's Board—has been held responsible for the company's failure to abide by the law and keep the investing public fully informed.").

**D.    Significant Litigation Pending Against LPHI, LPI and/or LPIFS**

18.    Currently, not including the Bankruptcy Case or the SEC Action, there are 11 open cases against LPHI and/or LPI in various federal courts.  Since 2006, LPHI and/or LPI have been parties to over 40 suits in federal court.  In addition, there are 12 open cases involving LPHI and LPI in state courts—seven in Texas, one in Illinois, three in California, and one in Florida.[5] *See, e.g.*, Dkt. No. 181.

19.    On information and belief, the expense of litigation is draining resources of LPI (and, therefore, resources and value from the Debtor).

20.    Filing these additional bankruptcy cases and granting the other relief requested herein is necessary given the integrated business model of LPHI, LPI, and LPIFS, the significant amount of ongoing litigation outside of this Bankruptcy Case, and the continuing role played by

---

[5] In addition to the district court cases, the SEC Action is currently pending before the Fifth Circuit, and the Texas Supreme Court heard oral argument in January 2015 regarding judgments of the Fifth and Third Courts of Appeals against LPHI and LPI.

**TRUSTEE'S EMERGENCY MOTION TO AMEND** **PAGE 6**
**THE GOVERNING DOCUMENTS AND FILE VOLUNTARY**
**CHAPTER 11 PETITIONS FOR SUBSIDIARIES**
522202 000002 14489653.12

members of former management in operations of LPI and LPIFS. If that occurs, the Trustee will be able more effectively to administer the Debtor's bankruptcy estates and ensure that value of the Debtor's assets and business enterprise is preserved and maximized for the benefit of all stakeholders.

21.    Though the Trustee has been appointed and begun to gather and secure the assets of LPHI in furtherance of his duties as chapter 11 trustee, the Trustee is limited in what he can do to manage and secure LPHI's most valuable assets, LPI and LPIFS, because LPI is not in bankruptcy. Similarly, LPIFS is a related operating entity whose resources should be managed and protected in connection with the bankruptcy administration of the enterprise as a whole.

22.    The Trustee hereby asks this Court to enter an order authorizing him to cause the Debtor, LPI, and LPIFS, as applicable, to (i) remove the current members of the boards of directors of LPI and LPIFS, (ii) amend the governing documents of the Debtor's wholly owned operating subsidiaries, LPI and LPIFS, (iii) elect the Trustee as sole director of LPI and LPIFS, and (iv) file voluntary chapter 11 bankruptcy petitions for LPI and LPIFS as he deems appropriate, seeking joint administration with the estate of the Debtor.

## III.    ARGUMENT AND AUTHORITIES

23.    Bankruptcy Code section 363(b) authorizes the Trustee to, after notice and a hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Bankruptcy Code section 105(a) authorizes the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). In so doing, the Court "should be afforded the latitude to fashion remedies [it] consider[s] appropriate under the circumstances." *Matter of Mendoza*, 111 F.3d 1264, 1270 (5th

Cir. 1997); *see also In re Cano*, 410 B.R. 506, 533 (S.D. Tex. 2009) (finding that § 105 exists to assist bankruptcy courts in fashioning equitable remedies to curb abuses).

24.     Pursuant to Bankruptcy Code sections 1106 and 1108, the Trustee is charged with investigating "the operation of the debtor's business" and operating the ongoing business of the Debtor.  *See* 11 U.S.C. §§ 1106, 1108.

25.     In this instance, the relief requested is necessary and appropriate to ensure the ongoing viability of the Debtor, as well as to allow the Trustee to exercise his powers in order to better manage the business, have the opportunity to preserve asset value, and consider the viable reorganization options for the enterprise as a whole.

**A.      Amending the Governing Documents of LPI and LPIFS is Appropriate to Allow the Trustee to Adequately Exercise his Powers**

26.     By this Motion, to the extent required and out of an abundance of caution, the Trustee seeks Court authorization to cause the Debtor, LPI, and LPIFS, as applicable, to (i) remove the current boards of directors of LPI and LPIFS, (ii) amend the governing documents of LPI and LPIFS, as necessary, to reduce the size of the respective boards of directors of LPI and LPIFS to one, and (iii) elect the Trustee as sole director of each of LPI and LPIFS for the purpose of, among other things, the filing of voluntary bankruptcy petitions, as is expressly authorized under Texas law.

**B.      LPI and LPIFS Bankruptcy Cases Will Facilitate the Discharge of the Trustee's Fiduciary Responsibilities to All Stakeholders**

27.     Once the Trustee has been elected as the sole director of LPI and LPIFS, he further seeks authority to file voluntary chapter 11 petitions for LPI and LPIFS because *inter alia* (i) LPI's and LPIFS's businesses will be an integral part of any reorganization of the Debtor, (ii) such bankruptcy cases will facilitate the Trustee's control over LPI and LPIFS in order to

implement appropriate changes in management, increase operational efficiencies, and reduce overhead, and (iii) the expense of myriad ongoing litigation is a drain on the business enterprise, which will be alleviated by  the imposition of the automatic stay for the benefit of LPI and LPIFS.

28.    Pursuant to section 1108 of the Bankruptcy Code, the Trustee is authorized to "operate [LPHI's] business," which is in large part conducted through its operating subsidiaries, LPI and LPIFS.  11 U.S.C. § 1108.  Furthermore, section 363(b) authorizes the Trustee to "use, sell or lease . . . property of the estate" outside of the ordinary course of business.  11 U.S.C. § 363(b).  In light of these provisions, courts permit chapter 11 trustees to file bankruptcy petitions on behalf of subsidiaries of the debtor.  *See, e.g., Order Authorizing the Chapter 11 Trustee To Revoke Cancellation and to File Voluntary Chapter 11 Petition for GGW Marketing LLC* [Dkt. No. 153]*, 2:13-bk-15130-S-K, In re GGW Brands, LLC* (C.D. Cal. May 20, 2013); *see also In re Consolidated Auto Recyclers, Inc.*, 123 B.R. 130, 140-41 (Bankr. D. Maine 1991); *see also In re John Hicks Chrysler-Plymouth, Inc.*, 152 B.R. 503, 510 (Bankr. E.D. Tenn. 1992) (holding that the bankruptcy trustee, who elected himself sole director of parent corporation, could vote parent corporation's stock in subsidiary to elect himself sole director of subsidiary without first giving notice to pledgee, and as sole director of subsidiary, could place subsidiary in bankruptcy without giving notice to pledgee); *see also In re Porter McLeod, Inc.*, 231 B.R. 786, 800 (D. Col. 1999) (describing how chapter 7 trustee caused debtor's four subsidiaries to file bankruptcy petitions); *see also In re American Way Serv. Corp.*, 229 B.R. 496, 501 n.7 (Bankr. S.D. Fla. 1999) (noting that chapter 11 trustee caused debtor's wholly-owned subsidiary to file a chapter 11 petition).

29.     For instance, in *In re Consolidated Auto Recyclers,* the chapter 11 trustee took action, without prior court approval, to cause the debtor's subsidiary to file a chapter 11 petition, including amending the subsidiary's bylaws, removing all of the subsidiary's directors, and electing the trustee as the sole director.  123 B.R. at 136.  The trustee then executed a unanimous written consent of stockholders and directors that removed all of the subsidiary's incumbent officers and elected the trustee as president, treasurer, and secretary, and authorized the filing of a petition.  *Id.*  When a creditor moved to dismiss the subsidiary's bankruptcy case, the bankruptcy court held that the trustee's "actions as the individual with decision making capacity for [the parent]" were "authorized under attendant principles of corporate governance."  *Id.* at 139.  Although the court held that the trustee should have first obtained court authorization for the filing, it nonetheless granted such authority *nunc pro tunc* because, *inter alia*, "the trustee's actions in initiating Chapter 11 proceedings for [the subsidiary] preserved the opportunity to challenge [a creditor's] security interest as a preference…and, therefore, stands to benefit the estate."  *Id.* at 142.

30.     *Here*, the Trustee, among other things, seeks authority to file a voluntary chapter 11 petitions for LPI and LPIFS because LPI's and LPIFS's businesses are inextricably intertwined with the Debtors' business and will be an integral part of the administration of the Debtors' bankruptcy cases as well as any plan of reorganization.  As a practical matter, as United States District Judge James R. Nowlin stated in the SEC Action, "[g]iven that LPHI has no income except that which comes from LPI's business operations, the Court is at a loss to find a single meaningful difference between LPHI's business and LPI's business. . . . Consequently, the Court holds that while LPI may not be a named defendant in this action, its business conduct is germane to the issue in this case."  Dkt. No. 14, at Exhibit T to the SEC Motion, at p. 5.  Further,

LPI and LPHI share physical offices, file consolidated financial statements, and LPHI reports on

LPI's litigation in its annual reports. *Id.* at Exhibit T to the SEC Motion, at p. 4. As the primary

operating subsidiary, securing and preserving the assets of LPI is essential to the Debtor's

reorganization effort.

31.     The Trustee needs control over LPI in order to, among other things, implement

appropriate changes in management, increase operational efficiencies, and reduce overhead.

During the pendency of the Bankruptcy Case (but prior to the Trustee's appointment), the Board

retained Mr. Pardo as a consultant to LPI and Mr. Peden as LPI's general counsel, even after the

jury found that Mr. Pardo and Mr. Peden committed fraud in violation of Section 17(a)(1) of the

Securities Act of 1933 and Section 13(a) of the Securities and Exchange Act of 1934. Dkt. No.

14, at Exhibit A to the SEC Motion, at p. 1, 3 (finding that although the defendants argue the

charges were minor, the "charges are not minor at all…[as] the jury judged that LPHI, Pardo,

and Peden deprived the investing public of the information it needed to make a fully informed

decision about whether to invest in Life Partners"). The Trustee needs control over LPI in order

to implement appropriate changes in management, including but not limited to certain executives

and the current board members.[6] Additionally, since the time that the Trustee was appointed, he

has had the opportunity to review LPI's operations.

32.     Mitigation of the cost of expensive, ongoing litigation against LPI and/or LPIFS

is among his chief reasons for seeking authority to file a voluntary chapter 11 petition for LPI. It

is well-settled that a party may file a bankruptcy petition for the purpose of availing itself of the

rights and protections the Bankruptcy Code affords. *See, e.g., Platinum Capital, Inc. v. Sylmar*

---

[6] "[Mr. Ballantyne] remains on the Board. This is not altogether surprising. No one—not Pardo, not Peden, not the members of LPHI's Board—has been held responsible for the company's failure to abide by the law and keep the investing public fully informed." Dkt. No. 14, at Exhibit A to the SEC Motion, at p. 7.

*Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1075 (9th Cir. 2002) ("The fact that a debtor proposes a plan in which it avails itself of an applicable Code provision does not constitute evidence of bad faith." (internal quotation marks and citation omitted)); *In re Consolidated*, 123 B.R. at 142 (retroactively authorizing trustee to file petition on behalf of debtor's subsidiary where trustee stated that challenging preferential security interest in subsidiary's assets was among reasons for filing). Multiple suits are currently pending against LPI which are intertwined with similar claims against the Debtor. Permitting such cases to continue to be advanced will result in an unnecessary depletion of assets and the risk of inconsistent results if the issues which are central to the administration of this Bankruptcy Case ultimately are resolved in various forums outside of this Court.

33.    Upon filing of bankruptcy cases for LPI and LPIFS, the Trustee will seek administrative consolidation of the cases which will help facilitate the efficient administration of the debtors' bankruptcy cases. In addition, the Trustee, in that circumstance, will have the power to reduce waste and overhead, and maximize the debtors' operational efficiencies for the benefit of all stakeholders.

## IV.    CONCLUSION

WHEREFORE, the Trustee respectfully requests that this Court enter an order granting this Motion in its entirety and authorizing him to cause the Debtor, LPI, and LPIFS, as applicable, to (i) remove the current members of the boards of directors of LPI and LPIFS, (ii) amend the governing documents of LPI and LPIFS, entities wholly owned and managed by LPHI, (iii) elect the Trustee as the sole director of each of LPI and LPIFS, (iv) take such actions as are necessary to cause LPI and LPIFS to file voluntary chapter 11 bankruptcy petitions,

seeking joint administration with the estate of the Debtor, and (v) granting such other and further

relief this Court deems just and proper.

DATED:  March 25, 2015.

Respectfully submitted,

**THOMPSON & KNIGHT LLP**

By:     _/s/ Katharine Battaia Clark_

David M. Bennett
Texas Bar No. 02139600

Richard B. Roper
Texas Bar No. 17233700

Katharine Battaia Clark
Texas Bar No. 24046712

1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone:  214/969-1700
Facsimile: 214/969-1751
David.Bennett@tklaw.com
Richard.Roper@tklaw.com
Katie.Clark@tklaw.com

**(PROPOSED) ATTORNEYS FOR CHAPTER 11
TRUSTEE H. THOMAS MORAN II**

# TAB 7

# CERTIFICATE OF SERVICE

I certify that on October 13, 2023, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon the following registered CM/ECF users:

Stephen G. Yoder
Megan Barbero
Kristina Guidi
Nicole C. Kelly
Emily True Parise
Emily Pasquinelli
U.S. Securities & Exchange Commission
100 F Street, N.E.
Washington, DC 20549

/s/ Brian J. Leske
Brian J. Leske