No. 23-60216

# In the United States Court of Appeals for the Fifth Circuit

---

JOHN M. BARR; JOHN MCPHERSON,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

---

On Petition for Review of a Final Order
of the U.S. Securities and Exchange Commission

---

## RECORD EXCERPTS FOR PETITIONER JOHN M. BARR

---

J. Kevin Edmundson
EDMUNDSON SHELTON WEISS PLLC
600 East Highway 290
Dripping Springs, TX  78620
Tel.:  (512) 720-0782
*kevin@eswpllc.com*

Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX  75201
Tel.:  (303) 382-6219
*daniel.geyser@haynesboone.com*

*Counsel for Petitioner John M. Barr*

## TABLE OF CONTENTS

**Record Cite**

Tab 1: Final order determining whistleblower award claims............ ROA.1766

Tab 2: Preliminary decision................................................................ ROA.1549

Tab 3: SEC's motion to appoint a Chapter 11 trustee................ Bankr. Doc. 14

Tab 4: Barr's petition for review (without attachment) .......... 5th Cir. Doc. 1-1

Tab 5: Certificate of service

TAB 1



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

DIVISION OF
ENFORCEMENT

March 27, 2023

<u>**VIA SECURE EMAIL**</u>

J. Kevin Edmundson, Esq.
Edmundson | Shelton | Weiss PLLC
317 Grace Lane, Suite 210
Austin, TX 78746
kevin@eswpllc.com

Re:     **John M. Barr**
        **Notice of Covered Action 2015-036**
        *SEC v. Life Partners Holdings, Inc., et al.*

Dear Mr. Edmundson:

I am writing to inform you that the Commission has issued a Final Order awarding your client, John M. Barr, 5% of the amounts collected or to be collected in connection with the above-referenced Covered Action.  A copy of the Final Order is enclosed with this letter.  We have also enclosed an additional declaration from Enforcement staff in support of the Final Order, which is being furnished to you subject to the confidentiality agreement that you signed on November 30, 2020.

Please accept our congratulations and sincere thanks to you and your client for the information and assistance you provided to the SEC in this matter.

Please do not hesitate to contact me if you have any questions or concerns.

Best regards,

Nicole C. Kelly
Chief
Office of the Whistleblower

Enclosures:
Non-Public Final Order (redacted)
Gulde Supplemental Declaration
Gulde Supplemental Addendum Declaration

**R1665**

**Non-Public**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 97202 / MARCH 27, 2023

WHISTLEBLOWER AWARD PROCEEDING
File No. 2023-42

---

In the Matter of the Claims for an Award

in connection with

*SEC v. Life Partners, Inc., et al.,*
12-CV-00002 (W.D. Tex., filed Jan. 3, 2012)

Notice of Covered Action 2015-036

---

## ORDER DETERMINING WHISTLEBLOWER AWARD CLAIMS

The Claims Review Staff ("CRS") issued Preliminary Determinations recommending that (i) ███████ ("Claimant 1") receive a whistleblower award equal to ███████ percent (█%) of the monetary sanctions collected, or to be collected, in connection with the above referenced Covered Action (the "Covered Action"); (ii) ███████ ("Claimant 2") receive a whistleblower award equal to ███ percent (█%) of the monetary sanctions collected, or to be collected, in connection with the Covered Action; and (iii) the whistleblower award applications submitted by ███████ ("Claimant 3") and John Barr ("Claimant 4") in connection with the Covered Action be denied. Each of the Claimants filed a timely response contesting the Preliminary Determination.

After review of the reconsideration requests and additional information submitted by Claimant 4, we find Claimant 4 to be eligible for an award. Accordingly, we reallocate a maximum thirty percent award among Claimants 1, 2, and 4 and (i) award Claimant 1 ███ percent (█%) of the monetary sanctions collected or to be collected in the Covered Action, equal to over $21,000, (ii) award Claimant 2 ███ percent (█%) of the monetary sanctions collected or to be collected in the Covered Action, equal to over $5,000, and (iii) award Claimant 4 five percent (5%) of the monetary sanctions collected or to be collected in the Covered Action, equal to over $5,000. We deny an award to Claimant 3.

23-60216.1767

**R1666**

## I.    Background

### A.    The Covered Action

In April 2010, staff in the United States Securities and Exchange Commission's ("Commission") Division of Enforcement ("Enforcement") opened a matter under inquiry to investigate certain conduct by Life Partners Holdings, Inc. (the "Company"), a public company in the business of brokering life settlements.  On January 3, 2012, the Commission filed a civil action in federal district court charging the Company and three of its officers with violations of the anti-fraud provisions of the federal securities laws.  *SEC v. Life Partners, Inc., et al.,* 12-CV-00002 (W.D. Tex.).  The Commission's Complaint alleged, among other things, that the Company systematically used life expectancies that were materially short in brokering life settlements leading to disclosure and accounting fraud.

On January 9, 2014, the district court entered a final judgment by consent in favor of the Commission that ordered one of the Company's officers, the CFO, to pay a civil penalty of $34,961.  The remaining defendants continued to trial, and the jury returned a verdict finding that each remaining defendant had violated Section 17(a)(1) of the Securities Act and that the Company violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder—and that these violations were aided and abetted by the CEO and General Counsel.  After the trial, the court set aside the Section 17(a)(1) verdict as unsupported by the evidence and declined to order reimbursement pursuant to Section 304 of the Sarbanes-Oxley Act ("SOX") against the CEO.  On January 16, 2015, the Court entered a final judgment ordering the Company to pay disgorgement of $15 million and a civil penalty of $23.7 million, and the CEO and General Counsel to pay civil penalties of $6.2 million and $2 million.  The defendants appealed the judgment.  The Commission filed a cross-appeal.

On January 20, 2015, the Company filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the Northern District of Texas, Case No. 15-40289-rfn-11 (the "Bankruptcy Action").  On December 9, 2016, the Revised Third Amended Plan of Reorganization of the Company became effective.  The plan established a trust to oversee the liquidation of the Company's assets and the distribution of the net proceeds to the Company's defrauded investors.  As part of the plan, the Commission received a Creditor's Trust Interest up to the amount of the Commission's Judgment Claim of $38.7 million and agreed that any distributions in respect of its Creditor's Trust Interest would be reallocated to investors.  In return, the Company dismissed its appeal.  The Commission also dismissed its cross-appeal.

As to the CEO and General Counsel, the Fifth Circuit reinstated the Section 17(a)(1) jury verdict and ordered the district court to reassess penalties as well as reimbursement against the CEO under Section 304 of SOX.  On September 28, 2018, on remand, the district court ordered (i) the CEO and General Counsel each to pay $6,500 in civil penalties for their Section 17(a) violations; (ii) the CEO to pay $3,555,000 in civil penalties for aiding and abetting the Company's Section 13(a) violations, (iii) the General Counsel to pay $2,000,000 in civil penalties for aiding and abetting the Company's Section 13(a) violations; and (iv) the CEO to reimburse the Company in the amount of $1,325,566 under Section 304 of SOX.

23-60216.1768

Non-Public

On April 1, 2015, the Office of the Whistleblower posted a Notice of Covered Action on the Commission's public website inviting claimants to submit whistleblower award applications within ninety days. Claimant 1, Claimant 2, and Claimant 4 submitted timely award claims on Form WB-APP. Claimant 3 submitted a claim on Form WB-APP on ██████████, almost two months after the deadline.

## B.    The Preliminary Determinations

The CRS issued Preliminary Determinations[1] recommending that Claimant 1 receive a whistleblower award of ██% and Claimant 2 receive a whistleblower award of █% of the monetary sanctions collected, or to be collected, in the Covered Action.

The CRS recommended that Claimant 4's application be denied because Claimant 4 did not submit information that led to the successful enforcement of the Covered Action within the meaning of Section 21F(b)(1) of the Exchange Act and Rules 21F-3(a)(3) and 21F-4(c) thereunder. In reaching the Preliminary Determination, the CRS noted that (i) the Enforcement staff opened the underlying investigation more than three years before Claimant 4 submitted his/her tip to the Commission; (ii) Claimant 4 did not testify at trial due to a ruling by the judge; (iii) although Claimant 4's information assisted the staff in preparing the Commission's motion for the appointment of a receiver, the court denied that motion and did not appoint a receiver, noting that the Commission would be able to seek the appropriate relief from the bankruptcy court; and (iv) Claimant 4's assistance in the bankruptcy proceedings does not qualify as having "led to the successful enforcement of" the Covered Action under Section 21F(b)(1) because it did not contribute to the process leading to the entry of the final judgment and consequent relief in the Commission's favor and also did not result in the subsequent entry of any additional relief for the violations alleged by the Commission.

The CRS also recommended that Claimant 3's application be denied because Claimant 3 did not submit information that led to the successful enforcement of the Covered Action within the meaning of Section 21F(b)(1) of the Exchange Act and Rules 21F-3(a)(3) and 21F-4(c) thereunder. In reaching the Preliminary Determination, the CRS noted that (i) the Enforcement staff opened the underlying investigation more than two years before Claimant 3 submitted his/her tip to the Commission; (ii) Claimant 3's information was not new or meaningful to the success of the Covered Action; (iii) Claimant 3 was not called to testify at the trial in the Covered Action; and (iv) while Claimant 3 identified a potential witness, Enforcement staff did not present that witness at trial. The CRS also recommended that Claimant 3's application be denied because Claimant 3 failed to meet the deadline for applying for an award in connection with the Covered Action and submitted a Form WB-APP almost two months late.[2]

---

[1]    *See* Exchange Act Rule 21F-10(d), 17 C.F.R. § 240.21F-10(d).

[2]    Exchange Act Rules 21F-10(a) ("A claimant will have ninety (90) days from the date of the Notice of Covered Action to file a claim for an award based on that action, or the claim will be barred") and 10(b)(1) ("All claim forms, including any attachments, must be received by the Office of the Whistleblower within ninety (90) calendar days of the date of the Notice of Covered Action in order to be considered for an award").

**Non-Public**

## C.  Claimants' Responses to the Preliminary Determinations

Claimant 1 submitted a timely written response contesting the Preliminary Determination.[3]  Specifically, Claimant 1 argues, alternatively, that (i) Claimant 1's award should be based on the amount that the Commission was "able to collect" rather than the amount it actually collected; (ii) Claimant 1's award should be based on any amounts collected by the bankruptcy trustee and distributed to defrauded investors; or (iii) the Commission should use its discretion under Section 36(a)(1) of the Exchange Act to exempt Claimant 1 from the whistleblower program rules and issue an appropriate award amount.

Claimant 2 submitted a timely written response contesting the Preliminary Determination.  Specifically, Claimant 2 argues that the Commission should use its discretion to award ██████████ to Claimant 2.  Claimant 2 asserts that this award amount is necessary in order for Claimant 2 to recover the losses Claimant 2 suffered as a result of ███████████ the Covered Action.

Claimant 4 submitted a timely written response contesting the Preliminary Determination.  Specifically, Claimant 4 argues that Claimant 4 is entitled to an award because Claimant 4's information led to the success of the Covered Action.  Claimant 4 claims that (i) Claimant 4 would have been an important witness were Claimant 4 allowed to testify at the trial; (ii) Claimant 4 provided new information and documents, including certain documents that the Commission introduced as evidence at trial; (iii) Claimant 4 identified a critical witness ("Witness") for the Commission at the trial; and (iv) Claimant 4 provided significant information and supporting evidence, including audio recordings of communications with the CEO that would have been helpful to the Commission in connection with the appointment of a receiver and that helped in the appointment of the bankruptcy trustee.  Claimant 4 also claims that even if staff were already aware of the Witness, he/she provided new, important information by telling staff that the Witness would make a good witness for the SEC at trial because of the Witness' acrimonious departure from the Company.  In addition, pursuant to a request from the Office of the Whistleblower ("OWB"), Claimant 4 provided information indicating that the Commission used the audio recordings provided by Claimant 4 in obtaining additional relief in the remanded final judgment.

Claimant 3 submitted a timely written response contesting the Preliminary Determination.  Specifically, Claimant 3 argues that Claimant 3 is entitled to an award because Claimant 3's information led to the success of the Covered Action by saving the Commission time and resources in focusing on the key documents and issues.  Claimant 3 claims that:  (i) Claimant 3 had multiple communications with Enforcement staff during the litigation; (ii) during the trial, Enforcement staff relied on the information Claimant 3 provided, namely, that there was ███████████████████████████████████████████ (iii) while the Commission may already have had the information described in (ii), Claimant 3's provision of this information saved significant Commission resources; and (iv) Claimant 3 initially was asked to testify at the trial, but

---

[3]  *See* Exchange Act Rule 21F-10(e), 17 C.F.R. § 240.21F-10(e).

23-60216.1770

**R1669**

ultimately did not do so.  Claimant 3 did not provide any explanation as to why Claimant 3 submitted the WB-APP late.

Upon further questioning by OWB as to the reason for the late WB-APP, Claimant 3's current counsel explained that Claimant 3 had been previously represented by another attorney, who had represented Claimant 3 with respect to all actions concerning the whistleblower submission and claim process.  According to Claimant 3's current counsel, on ██████████, Claimant 3 was conducting an internet search regarding the status of the SEC enforcement proceeding and discovered that a Notice of Covered Action had been posted.  Prior to that time, Claimant 3 was unaware of the Notice of Covered Action process, the existence or need to file Form WB-APP, or of the time requirements for filing.  Claimant 3 sent the information he/she had found during the search on ███████████ to his/her then-attorney, who then submitted the WB-APP the following day, ██████████.[4]  Claimant 3's current counsel asks that the Commission waive the filing deadline.

## III.   Analysis

### A.   Claimant 1

#### 1.   Award Analysis

The record demonstrates that Claimant 1 voluntarily provided original information to the Commission that significantly contributed to the success of the Covered Action.[5]  In reaching this determination, we assessed, among other things, the following facts:  (i) Claimant 1 provided information early in the investigation, beginning just three months after the Commission staff opened the matter; (ii) Claimant 1's information saved the staff time and resources in conducting its investigation and included ███████████ that the staff likely would not have uncovered without Claimant 1's help; (iii) ██████ Claimant 1 provided continuing assistance, including communicating with the staff on many occasions and providing voluminous documents to the staff; and (iv) there is a close nexus between Claimant 1's information and several paragraphs in the Commission's Complaint.

The CRS preliminarily determined that the aggregate award in this matter should be at the statutory maximum and that Claimant 1 should receive a ██% award and that Claimant 2 should receive a ██% award because Claimant 1's information was more significant and Claimant 1 provided extraordinary ongoing assistance.  Since then, Exchange Act Rule 21F-6(c) was adopted creating a presumption of a statutory maximum award of 30% where:  (i) the maximum award would be $5 million or less; (ii) the claimant's application presents no negative award factors under Rule 21F-6(b) – *i.e.*, culpability, unreasonable reporting delay, or interference with

---

[4]      We note that the dates provided by Claimant 3's counsel do not comport with other aspects of the record. Claimant 3 faxed the WB-APP to OWB on ██████████, and the WB-APP was dated ██████████.  As such, Claimant 3 must have become aware of the NoCA filing by no later than ██████████, and not on ██████████.

[5]      *See* Exchange Act Section 21F(b)(1), 15 U.S.C. § 78u-6(b)(1); Exchange Act Rule 21F-3(a), 17 C.F.R. § 240.21F-3(a).

23-60216.1771

**R1670**

**Non-Public**

an internal compliance and reporting system—and (iii) the award claim does not trigger Rule 21F-16.[6]  The Commission may depart from the presumption if:  (i) the assistance provided by the whistleblower was, "under the relevant facts and circumstances, limited," or (ii) a maximum award "would be inconsistent with the public interest, the promotion of investor protection, or the objectives of the whistleblower program."[7]

The 30% presumption applies in this matter.  Based on current collections, the statutory maximum award is approximately $32,000, and the Commission does not reasonably anticipate that future collections would cause the statutory maximum award to exceed $5 million.  No negative factors are associated with Claimant 1's application, Claimant 1 bears no responsibility for the misconduct, and Claimant 1 did not benefit financially from the wrongdoing.  There is nothing in the record that suggests Claimant 1 unreasonably delayed in reporting information to the Commission or interfered with the Company's internal compliance or reporting systems.  Also, there is no reason to depart from the presumption of the statutory maximum award.  Claimant 1 provided more than limited assistance.  Furthermore, there are no public interest, investor protection, or programmatic concerns that would warrant departure from a 30% award.

Based on these factors and all aspects of the record, and after considering Claimant 1's contributions relative to Claimant 2's and Claimant 4's contributions, we find that an award of ▮% is appropriate for Claimant 1.

## 2.    Request for Reconsideration

We disagree with Claimant 1's contention that Claimant 1's award calculation should be based on a larger amount than the Commission collected in connection with the Covered Action.  Claimant 1 notes that Exchange Act Rule 21F-5(b) provides, in part, that the amount of an award "will be at least 10 percent and no more than 30 percent of the monetary sanctions that the Commission and the other authorities are able to collect."  Claimant 1 asserts that the Commission was "able to collect" a much larger amount of monetary sanctions than it in fact did collect in the Covered Action, because it voluntarily subordinated its interest in the Bankruptcy Action to the interests of defrauded investors.  As such, Claimant 1 argues that Claimant 1's award should be based on the amount that the Commission could have collected rather than the amount that the Commission actually collected.

*First*, Claimant 1's argument is based on an incorrect factual premise, as Claimant 1 assumes that the Commission could have collected the full ▮▮▮▮▮ had it not voluntarily subordinated its interest in the bankruptcy proceeding.  The ▮▮▮ million civil penalty against the Company would have been disallowed or subordinated in the bankruptcy as a matter of law.  At best, the Commission, as a general unsecured creditor, could only have been able to recover a

---

[6]    Exchange Act Rule 21F-16 applies only when the claimant was ordered to pay sanctions or an entity whose liability was based substantially on conduct that the claimant directed, planned or initiated was ordered to pay sanctions in connection with the covered action. Rule 21F-16 is not applicable here.

[7]    Exchange Act Rule 21F-6(c)(1)(iv).

23-60216.1772

**R1671**

fraction of the disgorgement.[8]  Contrary to Claimant 1's assertions, the Commission did not simply walk away from a collection of ▮▮▮▮▮▮▮▮▮, because it would only have been able to collect a *de minimis* amount, and any such collections would have been dependent upon the Commission winning on appeal.

*Second,* we decline to follow Claimant 1's interpretation of Rule 21F-5(b) because it is at odds with the statute that it is designed to implement.  Congress established the statutory minimum and maximum whistleblower awards as "(A) not less than 10 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions; and (B) not more than 30 percent, in total, of what has been collected of the monetary sanctions imposed in the action or related actions."[9]  Because the statutory maximum whistleblower award is based on the amount actually collected in connection with the Covered Action, we cannot base the amount of Claimant 1's award on a higher amount that the Commission may have been able to but did not collect.

*Third*, calculating whistleblower award payments based on what the Commission hypothetically "was able to collect," but did not, would introduce uncertainty, inconsistency, and could delay the processing of award claims.

We also disagree with Claimant 1's argument that the award should be based on any amounts collected in the Bankruptcy Action.  As we noted in connection with the adoption of several rule amendments, "our statutory authority does not extend to paying whistleblower awards for recoveries in bankruptcy proceedings or other proceedings that may in some way 'result from' the Commission's enforcement action and the activities of the whistleblower."[10]  Under Section 21F of the Exchange Act, the Commission is authorized to pay whistleblower awards only on the basis of monetary sanctions that are imposed in a covered judicial or administrative action or related action.  A covered judicial or administrative action means an "action brought by the Commission under the securities laws that results in monetary sanctions exceeding $1,000,000."[11]  A related action must be brought by one of the authorities specified in the statute.[12]  Bankruptcy proceedings are not brought by either the Commission acting under the securities laws or by one of the designated related-action authorities, and orders to pay money that result from bankruptcy proceedings are not imposed in Commission covered actions or related actions.

Finally, we deny Claimant 1's request that the Commission use its discretion under Section 36(a)(1) of the Exchange Act to exempt Claimant 1 from the requirements under the whistleblower program and set Claimant 1's award amount above the statutory limit.  Section

---

[8]     The payout rate to unsecured creditors, like the Commission, was only ▮▮%.  Therefore, the Commission could only have collected ▮▮% of the final disgorgement, which at best would have been ▮▮▮▮▮▮▮▮▮ of the ▮▮▮▮▮▮ of disgorgement.

[9]     Exchange Act Section 21F(b)(1), 15 U.S.C. § 78u-6(b)(1).

[10]    *See* Whistleblower Program Rules, Release No. 34-899963, 2020 WL 5763381, at *12 (Sept. 23, 2020).

[11]    Exchange Act Section 21F(a)(1), 15 U.S.C. § 78u-6(a)(1).

[12]    *See* Exchange Act Section 21F(a)(5), 15 U.S.C. § 78u-6(a)(5).

Non-Public

36(a)(1) provides that "the Commission, by rule, regulation, or order, may conditionally or unconditionally exempt any person…from any provision or provisions of [the Exchange Act] or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors."[13]  We have used this discretionary authority to exempt whistleblowers from certain of the program's rules under limited circumstances.[14]  However, the limitation on the amount of the award to be issued in connection with any Covered Action was set by statute, and we have never used our discretion under Section 36(a)(1) of the Exchange Act to exempt a whistleblower from a statutory requirement or to approve an award amount above the statutory limit.  The text of the statute reflects a clear congressional design to grant awards of no more than 30 percent of the amounts collected.  Congress established the same framework for awards to be paid to whistleblowers in cases brought by the Commodity Futures Trading Commission[15] and under the Anti-Money Laundering Act.[16]  Given the clarity and consistency of the statutory design for whistleblower awards, the Commission does not believe it would be appropriate to use its exemptive authority to award an amount above the statutory limit even in cases such as this one, where a higher award amount might otherwise be warranted.

### B.    Claimant 2

#### 1.    Award Analysis

The record demonstrates that Claimant 2 voluntarily provided original information to the Commission that significantly contributed to the success of the Covered Action.  In reaching this determination, we assessed, among other things, the following facts: (i) Claimant 2 voluntarily submitted information to the Commission staff approximately nine months after the investigation was opened and before the Commission had filed its complaint against the Company; (2) Claimant 2 participated in an initial phone call with staff, provided documents related to Claimant 2's ▮▮▮▮▮▮, and provided ongoing assistance to the staff; (3) Claimant 2's information included information that was not previously known to the staff, and the information informed the direction of the staff's investigation and the charges ultimately brought against the Company.

As noted above, the presumption of a statutory maximum award of 30% applies in this matter.  Based on all aspects of the record, and after considering Claimant 2's contributions relative to Claimants 1's and Claimant 4's contributions, we find that an award of ▮% is appropriate for Claimant 2.

---

[13]    15 U.S.C. § 78mm(a)(1).

[14]    *See*, *e.g.*, Order Determining Whistleblower Award Claims, Release No. 34-90580 (Dec. 7, 2020) (providing whistleblower with exemption from the TCR filing requirements under Rules 21F-9(a) and (b)); Order Determining Whistleblower Award Claims, Release No. 34-86010 (June 3, 2019) (providing whistleblower with exemption from the voluntary requirement under Rule 21F-4(a)).

[15]    7 U.S.C § 26(b)(1).

[16]    31 U.S.C. § 5323(b)(1).

23-60216.1774

### 2. Request for Reconsideration

We decline Claimant 2's request that we set Claimant 2's award amount at ████████. As discussed above, the limit for a whistleblower award to all meritorious claimants in the aggregate is set by statute at 30% of the amount collected of the monetary sanctions imposed in the action or related actions. Even if Claimant 2 were the sole meritorious claimant, which Claimant 2 is not, a 30% award would be less than the amount Claimant 2 requests. We decline to set Claimant 2's award above the statutory limit. Further, whistleblower award payments are based on the amounts collected in the underlying Covered Action, not the amount of loss suffered by the claimant.

### C. Claimant 4's Award Analysis

The record demonstrates that Claimant 4 voluntarily provided original information to the Commission that significantly contributed to the success of the Covered Action. Specifically, we find that the audio recordings provided by Claimant 4 were helpful to the Commission in obtaining additional relief in the remanded final judgment.[17]

As noted above, the presumption of a statutory maximum award of 30% applies in this matter. Based on all aspects of the record, and after considering Claimant 4's contributions relative to Claimants 1's and Claimant 2's contributions, we find that an award of 5% is appropriate for Claimant 4.

### D. Claimant 3

Claimants must give the Commission information in the form and manner that the Commission requires in order to be eligible for a whistleblower award.[18] The Commission's rules require Claimants to file any application for a whistleblower award on Form WB-APP.[19] Further, the Form WB-APP must be filed within ninety days from the date of the Notice of Covered Action or the claim will be barred.[20] Claimants bear the ultimate responsibility to learn about and follow the Commission's rules regarding the award application process.[21]

The requirement that claimants file whistleblower award claims within ninety days of the posting of a Notice of Covered Action serves important programmatic functions. The deadline ensures fairness to potential claimants by giving all an equal opportunity to have their competing

---

[17]   We note that the other information provided by Claimant 4 did not significantly contribute to the success of the Covered Action, because, for example, the Enforcement staff had already obtained the information through other sources.

[18]   *See* Exchange Act Rule 21F-8(a), 17 C.F.R. § 240.21F-8(a).

[19]   *See* Exchange Act Rule 21F-10(b), 17 C.F.R. § 240.21F-10(b).

[20]   *See* Exchange Act Rule 21F-10(a), 17 C.F.R. § 240.21F-10(a).

[21]   *See* Order Determining Whistleblower Award Claim, Release No. 34-72659, at 5 (July 23, 2014).

**Non-Public**

claims evaluated at the same time. The deadline also brings finality to the claim process so that the Commission can make timely awards to meritorious whistleblowers.[22]

Notwithstanding these important programmatic functions, the whistleblower program rules recognize that there may be rare situations where an exception should be made. To allow for this, Rule 21F-8(a) of the Exchange Act provides that "the Commission may, in its sole discretion, waive" the filing requirements "upon a showing of extraordinary circumstances."[23] The Commission has explained that the "extraordinary circumstances" exception is "narrowly construed" and requires an untimely claimant to show that "the reason for the failure to timely file was beyond the claimant's control."[24] The Commission has identified "attorney misconduct or serious illness" that prevented a timely filing as two examples of the "demanding showing" that an applicant must make before the Commission will consider exercising its discretionary authority to excuse an untimely filing.[25] The Commission has previously found that "a lack of awareness about the [whistleblower] program does not . . . rise to the level of an extraordinary circumstance as a general matter [since] potential claimants bear the ultimate responsibility to learn about the program and to take the appropriate steps to perfect their award applications."[26] "A potential claimant's responsibility includes the obligation to regularly monitor the Commission's web page for NoCA postings and to properly calculate the deadline for filing an award claim."[27]

Claimant 3's lack of awareness of the NoCA posting or of the 90-day deadline is not an "extraordinary circumstance" that would excuse his/her failure to submit a timely Form WB-APP. Nothing interfered with his/her ability to monitor the Commission's web page or submit an application by the 90-day deadline. Furthermore, there are no unique circumstances here that might support the Commission's exercise of its separate, discretionary authority under Section 36(a) of the Exchange Act to exempt Claimant 3 from the 90-day filing deadline.[28]

---

[22] *See Securities Whistleblower Incentives and Protections*, 76 Fed. Reg. 34300, 34343 (June 13, 2011); Order Determining Whistleblower Award Claims, Release No. 95711 (Sept. 9, 2022); Order Determining Whistleblower Award Claims, Release No. 88464 (Mar. 24, 2020); Order Determining Whistleblower Award Claims, Release No. 96765 (Jan. 30, 2023).

[23] 17 C.F.R. § 240.21F-8(a).

[24] Order Determining Whistleblower Award Claims, Release No. 77368, at 3 (Mar. 14, 2016), *pet. for rev. denied sub nom. Cerny v. SEC*, 708 F. App'x 29 (2d Cir. 2017), cert. denied, 138 S. Ct. 2005 (2018).

[25] Order Determining Whistleblower Award Claim, Release No. 77368; Order Determining Whistleblower Award Claim, Release No. 82181 (Nov. 30, 2017).

[26] Order Determining Whistleblower Award Claims, Release No. 95711 (Sept. 9, 2022) (citing to Order Determining Whistleblower Award Claim, Release No. 88464 (Mar. 24, 2020)).

[27] *Id.* The whistleblower rules provide "for constructive, not actual, notice of the posting of a covered action and of the deadline for submitting a claim." *Id; see also* Order Determining Whistleblower Award Claims, Release No. 96765 (Jan. 30, 2023) (finding that claimant's lack of awareness about the whistleblower program and limited understanding of the whistleblower rules "failed to meet the demanding standard for showing that there were extraordinary circumstances").

[28] *Cf.* Order Determining Whistleblower Award Claims, Release No. 92086 (June 2, 2021) (exercising Section 36(a) exemptive authority to waive the 90-day deadline where the claimant faced "unique obstacles" to timely filing the claim).

**R1675**

**Non-Public**

We therefore conclude that Claimant 3 failed to submit a claim for award on Form WB-APP to the Office of the Whistleblower within ninety days of the date of the Notice of Covered Action as required under Rule 21F-10(b) of the Exchange Act and that, as a result, Claimant 3 is ineligible for an award with respect to the Covered Action.[29]

## IV.   Conclusion

Accordingly, it is ORDERED that Claimant 1 receive an award of ███ percent (██%) of the monetary sanctions collected, or to be collected, in the Covered Action; Claimant 2 receive an award of ███ percent (█%) of the monetary sanctions collected, or to be collected, in the Covered Action; Claimant 4 receive an award of five percent (5%) of the monetary sanctions collected, or to be collected, in the Covered Action; and that Claimant 3's award application be denied.

By the Commission.

*Vanessa Ann Countryman*

Vanessa A. Countryman
Secretary

---

[29]   Because Claimant 3 is ineligible for an award based on the late filing of a Form WB-APP, we decline to consider whether Claimant 3's information led to the success of the Covered Action.

23-60216.1777

**R1676**

## **SUPPLEMENTAL DECLARATION OF MATTHEW J. GULDE**

I, Matthew J. Gulde, declare as follows:

1. I am an attorney in the Division of Enforcement ("Enforcement") of the U.S. Securities and Exchange Commission (the "Commission"), located in its Fort Worth Regional Office. I make this declaration based upon my personal knowledge, which includes information I learned as one of the primary litigation attorneys assigned to a Commission enforcement action, *SEC v. Life Partners Holdings, Inc., et al.* (the "Life Partners action") and to represent the Commision's interests in a bankruptcy proceeding styled *In re Life Partners Holdings, Inc.* (the "Bankruptcy Case").

2. I learned much of the information set forth in this declaration from documents I reviewed in the course of the litigation; interviews and depositions that I conducted or witnessed; and other information provided to me by other Commission staff. I also reviewed the response submitted by John Barr ("Barr" or "Claimant 4") as part of his request for reconsideration of the Claims Review Staff's ("CRS") Preliminary Determination to deny him an award in the Life Partners action. Dates and numbers set forth in this declaration are approximations.

3. On November 10, 2020, I executed a declaration (the "Initial Declaration") that I understand was provided to the CRS to inform the CRS's Preliminary Determination concerning the application of Claimant 4 for a whistleblower award in the Life Partners action. I take this opportunity to reaffirm the accuracy of all statements I made in the Initial Declaration, except as explicitly corrected here, and all of those statements should be deemed to be incorporated herein by reference.

### **John Barr**

4. In the Initial Declaration, I stated, among other things, that (i) Barr was not the source or impetus of the Life Partners investigation; (ii) Barr's purported first contact with Commission staff relating to this matter in April 2012 was after the Commission had already commenced litigation with Life Partners Holdings, Inc. ("LPHI") and others (Jan. 3, 2012), and well after the Life Partners investigation had been completed;[1] (iii) Barr provided a TCR in September 2013, containing information about a specific life settlement policy that he had invested in and also sold to his friends, which he believed had been fraudulently misrepresented to him by Life Partners; (iv) while we thought that

---

[1] In connection with his Response to the Preliminary Determination, Barr includes a declaration from former Enforcement attorney Toby Galloway, which affirms that Barr reached out to him sometime in 2012, a few months after the Commission had filed an action against LPHI and others.

**R1677**

Barr would make a good witness at the trial, the district court did not allow the SEC to call Barr as a witness at the trial; and (v) while Barr provided information that would have been helpful to the SEC at the receivership hearing, the district court denied the SEC's motion for a receiver because LPHI filed for bankruptcy on the eve of the receivership hearing.

5. As part of his Reconsideration Request, Barr claims: (i) he would have been an important witness were he allowed to testify at the trial; (ii) he provided new information and documents, including the Strassman Policy and a White Paper, that the SEC introduced as evidence at trial; (iii) that he identified Jim Sundelius, a critical witness for the SEC at the trial; and (iv) that he provided significant information and supporting evidence, including audio recordings of communications with a defendant, Brian Pardo, that would have been helpful to the SEC in connection with the appointment of a receiver and that helped in the appointment of the bankruptcy trustee.

6. Mr. Barr communicated often and at length with the trial team in the months before, during, and after trial. As I stated in the Initial Declaration, the SEC wanted to call Barr as a witness at the trial to testify, but the defendants moved to prevent him from testifying, citing unfairness and surprise, and ultimately Barr was not allowed to testify at the trial.

7. After trial and before the SEC sought the appointment of a receiver, Mr. Barr made and provided recordings in which Brian Pardo minimized the impact of the SEC's win at trial. Similarly, Mr. Barr obtained and provided copies of Brian Pardo's memoir, *Junkyard Dog*. The SEC explicitly relied on Mr. Barr's materials in asking the district court for the appointment of a receiver. However, because Life Partners filed for bankruptcy on the eve of the receivership hearing, the court denied the SEC's motion for a receiver. As such, the recordings and memoir provided by Barr were not used in obtaining a receiver, because no receiver was appointed. While these materials did not help in the appointment of a receiver, because none was appointed, the recordings and book aided the SEC's effort in seeking the appointment of a bankruptcy trustee. Mr. Barr also testified during LPHI's bankruptcy proceeding and his testimony advanced the Commission's effort in seeking the appointment of a trustee.

8. Mr. Barr testified to great effect in LPHI's bankruptcy proceedings, and his testimony advanced the Commission's effort in seeking the appointment of a trustee. In particular, his testimony clearly established that LPHI (1) continued to make the false claims that had led to the SEC's judgment against it; (2) continued to use Dr. Cassidy's life expectancy calculations in reselling old policies; and (3) was victimizing investors in a new way after trial: charging a new and previously undisclosed administrative fee.

**R1678**

9. Mr. Barr correctly points out that the Strassman Policy was admitted into evidence in the district court. However, the Strassman Policy and related documents, admitted into evidence as Exhibit 371-U, had already been provided by LPHI during litigation (independent of Mr. Barr's involvement) and served the same purpose that several other admitted policies did: showing that Dr. Cassidy's life expectancy (and therefore LPHI's sale-side life expectancy) was vastly shorter than actuarial (and the LPHI's buy-side) life expectancy. In other words, we already were aware of and possessed the Strassman Policy prior to Barr providing it to Commission staff. And because Barr was not able to testify at the trial, he was not able to provide information about his dealings with this particular LPI-brokered policy at the trial.

10. Mr. Barr points to LPHI's "White Paper" that was admitted into evidence as another example of his providing new evidence. I accept Mr. Barr's representation that the SEC did not have this document until he provided it, but I disagree with the importance that Barr puts on it. The White Paper was admitted into evidence and discussed at trial. Scott Peden testified that he did not recall this specific document. While Mr. Barr contends that this document "proved that Life Partners was aware of and accepted Dr. Cassidy's . . . negligent methodologies," I do not believe that it proved these things at trial. As Mr. Barr notes in his declaration, Life Partners created this document "to justify its business model . . . and perpetuate the fraud." Discussed so briefly at trial, it is unreasonable to conclude that this document moved the jury on the issue of Cassidy's methods or LPHI's knowledge of them. Even if Barr was the first individual to provide the White Paper to Commission staff, the use of it at trial did not substantially advance the SEC's success at trial.

11. Mr. Barr states that he was instrumental in lining up the testimony of Jim Sundelius, an LPI master licensee. (Barr Decl., ¶ 11). The testimony of Mr. Sundelius was critically significant at trial. However, we were already aware of Mr. Sundelius' role in connection with Life Partners, and had already identified Mr. Sundelius as a potential witness, prior to receiving information from Mr. Barr about Mr. Sundelius. We also had already identified Mr. Sundelius' firm on our witness list. Further, both Mr. Barr and Claimant 3 contacted the SEC virtually simultaneously with the news that Mr. Sundelius had left Life Partners.

12. While Mr. Barr believes that his providing the recordings of Brian Pardo and *Junkyard Dog* played "a key role in Judge Nowlin's Final Judgment" (Barr Decl. ¶28), this is not supported by the record. Mr. Barr states that he provided these materials in January 2015 (Barr Decl. ¶¶ 21-27). The trial court had already entered its Final Judgment on December 2, 2014. While the court later entered a short-form Final Judgment on January 16, 2015, the later order merely repeated the exact same relief and omitted the memorandum opinion from the order. While extremely helpful in the receivership effort

**R1679**

and subsequent bankruptcy proceedings, I do not believe that the recordings of Brian Pardo and his admissions in *Junkyard Dog* played a meaningful role in the trial court's Final Judgment.

I, Matthew J. Gulde, declare under penalty of perjury that the foregoing is true and correct.

Executed on January 10, 2022

MATTHEW J. GULDE

4

23-60216.1781

## Addendum to Supplemental Declaration of Matthew J. Gulde

1. I am an attorney in the Division of Enforcement ("Enforcement") of the U.S. Securities and Exchange Commission (the "Commission"), located in its Fort Worth Regional Office.  I make this declaration based upon my personal knowledge, which includes information I learned as one of the primary litigation attorneys assigned to a Commission enforcement action, *SEC v. Life Partners Holdings, Inc., et al.* (the "Life Partners action") and to represent the Commission's interests in a bankruptcy proceeding styled *In re Life Partners Holdings, Inc.*

2. I learned much of the information set forth in this declaration from documents I reviewed in the course of the litigation; interviews and depositions that I conducted or witnessed; and other information provided to me by other Commission staff.  I also reviewed the response submitted by John Barr ("Barr" or "Claimant 4") as part of his request for reconsideration of the Claims Review Staff's ("CRS") Preliminary Determination to deny him an award in the Life Partners action.  Dates and numbers set forth in this declaration are approximations.

3. On November 10, 2020, I executed a declaration (the "Initial Declaration") that I understand was provided to the CRS to inform the CRS's Preliminary Determination concerning the application of Claimant 4 for a whistleblower award in the Life Partners action.  I take this opportunity to reaffirm the accuracy of all statements I made in the Initial Declaration, except as explicitly corrected here, and all of those statements should be deemed to be incorporated herein by reference.

4. On January 10, 2022, I executed an additional declaration to respond to the arguments raised by Claimant 4 in his response to the Preliminary Determination (the "Supplemental Declaration").  I wish to provide this Addendum to the Supplemental Declaration to further clarify Paragraph 12 of the Supplemental Declaration.

5. While Claimant 4 provided the recordings of Brian Pardo after the December 2, 2014 Final Judgment, the SEC used the recordings in its moving papers to preserve and obtain the relief in the Final Judgment on remand after the Fifth Circuit reinstated the SEC's Section 17(a) claim and other relief under the Sarbanes-Oxley Act ("SOX").  In Docket 424 (SEC Reply to Scott Peden's Response to Motion to Enter Judgment), the SEC cites to Docket 338-1 (SEC Staff Declaration describing the recordings) as an example of the defendants not having admitted to their wrongdoing and continuing their scheme of deception by "marginalizing the severity of the federal securities laws they violated and calling them 'minor.'"  In Docket 427 (Report and Recommendation of the U.S. Magistrate Judge), the Magistrate Judge found that the evidence "supports that Defendants have not admitted their wrongdoing or acknowledged their actions were harmful, before or during the investigation of the case by the Commission."  In granting Section 17(a) injunctive relief in the September 28, 2018 Remanded Final Judgment, the

1

**R1681**

district court found that the Magistrate Judge correctly applied the evidence to the *Gann* factors, one of which is the "sincerity of the defendant's recognition of his transgression." In addition, the district court declined to grant leniency and concluded that the penalties assessed in the Order were appropriate, referencing "the decades of time over which the Defendants 'did not seem to recognize the severity of their transgressions.'"  The Remanded Final Judgment is important because it reestablished the basis for injunctive relief against Pardo and Peden, reassessed the civil penalties against Pardo and Peden, including adding Section 17(a) penalties, and determined the appropriate SOX Section 304 reimbursement owed by Pardo.

I, Matthew J. Gulde, declare under penalty of perjury that the foregoing is true and correct.

Executed March 6, 2023

Gulde,
Matthew

Digitally signed by Gulde, Matthew
Date: 2023.03.06 11:31:22 -06'00'

MATTHEW J. GULDE

TAB 2



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

DIVISION OF
ENFORCEMENT

September 28, 2020

Emily Pasquinelli, Assistant Director
Office of the Whistleblower
Phone:  (202) 551-4790
Fax: (703) 813-9322

VIA SECURED MAIL: kevin@eswpllc.com
J. Kevin Edmundson, Esq.
Edmundson Shelton & Weiss PLLC
317 Grace Lane, Suite 210
Austin, TX 78746

Re:    Notice of Covered Action 2015-036
       *SEC v. Life Partners Holdings, Inc., et al.*

Dear Mr. Edmundson:

I am writing to inform you that our Claims Review Staff has reviewed the application for a whistleblower award submitted on Form WB-APP by your client, John Barr, in connection with the above-referenced Covered Action.  The Claims Review Staff has made a Preliminary Determination setting forth its preliminary assessment that Mr. Barr's claim should be denied. The Preliminary Determination is enclosed with this letter.

**Procedures for Contesting the Preliminary Determination**

If you wish to contest the Preliminary Determination, you may do so by submitting a single written response to the Office of the Whistleblower setting forth the grounds for your objection to the denial of your claim.  Your written response should be **no more than 20 double-spaced pages** and should strive to address the Preliminary Determination's findings and conclusions.  You may provide legal analysis. You may also provide additional information— including documentation and other evidentiary support—that either was not previously (i) requested as part of your application or (ii) reasonably available to you.  You are encouraged not to simply repeat the same facts as contained in your original application for an award.

Before determining whether to contest the Preliminary Determination, you may request that our office make available for your review the materials that formed the basis of the Preliminary Determination as set forth in Rule 21F-12(a) of the Securities Exchange Act of 1934 ("Exchange Act").  You may also request a meeting with the Office of the Whistleblower; however, such meetings are not required and we may in our sole discretion decline the request.

**R1465**

Both the request to review the materials that formed the basis of the Preliminary Determination and the request to meet with our office must be in writing and must be sent **within thirty (30) calendar days** of the date of the Preliminary Determination.  Failure to submit these requests within the 30 day period will be deemed as waivers of your right to review the materials and/or request a meeting.

If you decide to contest the Preliminary Determination, you must submit your written response and supporting materials **within sixty (60) calendar days** of the later of (i) the date of the Preliminary Determination or (ii) the date when we made materials available for your review pursuant to a timely request for those materials.  If you submit a timely response, then the Claims Review Staff will consider the issues and grounds advanced in your response, along with any timely supporting documentation you provided, and will make its Proposed Final Determination on your application for award.  Any submissions, including supplemental submissions or supporting documentation, made outside the 60 day period will not be accepted by the Office of the Whistleblower and will not be considered by the Claims Review Staff in their determination of your award application.

### If Preliminary Determination is Not Contested

Please note that if you choose not to submit a response to the Preliminary Determination or if you fail to submit a timely response, then the Preliminary Determination will become the Final Order of the Commission.  Your failure to submit a timely response contesting the Preliminary Determination will constitute a failure to exhaust administrative remedies, and you will be prohibited from pursuing an appeal pursuant to Rule 21F-13 of the Exchange Act.

### Issuance of Final Order of the Commission

If you contest the Preliminary Determination, the Claims Review Staff will consider your arguments and issue a Proposed Final Determination to the Commission.  Any Commissioner may request that the Proposed Final Determination be reviewed by the full Commission within thirty (30) days after we have informed the Commission of the Proposed Final Determination.  If no Commissioner requests such a review within the 30-day period, then the Proposed Final Determination will become the Final Order of the Commission.  In the event a Commissioner requests a review, the Commission will review the record that the Claims Review Staff relied upon in making its determinations, including your previous submissions to our office, and issue its Final Order.  We will inform you of the Final Order of the Commission.

### Appealing Final Order of the Commission

Any determination made under the whistleblower rules, including whether, to whom, or in what amount to make awards, shall be in the discretion of the Commission.  You may appeal the Commission's determination of whether or to whom to make an award to the United States Court of Appeals for the District of Columbia Circuit, or to the circuit where you reside or have

**R1466**

your principal place of business, within thirty (30) days after the Commission issues its final decision.

Please call us at 202-551-4790 if you have any questions or concerns.

Sincerely,

Emily Pasquinelli

Enclosure

**R1467**

## PRELIMINARY DETERMINATIONS OF THE CLAIMS REVIEW STAFF

In response to the above-referenced Notice of Covered Action, the U.S. Securities and Exchange Commission received four whistleblower award claims. Pursuant to Section 21F of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 21F-10 promulgated thereunder, the Claims Review Staff has evaluated each of these claims in accordance with the criteria set forth in Rules 21F-1 through 21F-17. The Claims Review Staff sets forth its Preliminary Determinations as follows.

_____ ("Claimant 1")



R1468



("Claimant 2")

("Claimant 3")

**R1469**



John Barr ("Claimant 4")

The Claims Review Staff has preliminarily determined to recommend that the Commission deny an award to Claimant 4. The basis for this determination is that Claimant 4's whistleblower submission did not lead to the successful enforcement of the Covered Action within the meaning of Section 21F(b)(1) of the Exchange Act and Rules 21F-3(a)(3) and 21F-4(c) thereunder. Claimant 4's information did not:

a. cause the Commission to (i) commence an examination, (ii) open or reopen an investigation, or (iii) inquire into different conduct as part of a current Commission examination or investigation under Rule 21F-4(c)(1) of the Exchange Act; or

b. significantly contribute to the success of a Commission judicial or administrative enforcement action under Rule 21F-4(c)(2) of the Exchange Act.[8]



---

[8]    In preliminarily finding that the information Claimant 4 provided to the Commission did not lead to the success of the action, we have relied on the following facts, among others, that are identified in a declaration provided by one of the principal attorneys involved with the Covered Action:  (1) Claimant 4 filed a TCR more than three years after the Commission began its investigation; (2) Claimant 4 did not testify at trial because of a ruling by the judge; (3) although Claimant 4's information assisted the staff in preparing the Commission's motion for the appointment of a receiver, the court denied that motion and did not appoint a receiver, noting that the Commission would be able to seek the appropriate relief from the bankruptcy court; and (4) Claimant 4's assistance in the bankruptcy proceedings does not qualify as having "led to the successful enforcement of" the covered action under Section 21F(b)(1) because it did not contribute to the process leading to the entry of the final judgment and

By:    Claims Review Staff

Date:  September 28, 2020

---

consequent relief in the Commission's favor and also did not result in the subsequent entry of any additional relief for the violations alleged by the Commission.

23-60216.1555

**R1471**

TAB 3

**Jessica B. Magee**
**Texas Bar No. 24037757**
**Matthew J. Gulde**
**Illinois Bar No. 6272325**
**B. David Fraser**
**Texas Bar No. 24012654**
**U.S. Securities and Exchange Commission**
**Burnett Plaza, Suite 1900**
**801 Cherry Street, Unit #18**
**Fort Worth, TX 76102-6882**
**(817) 978-6465 (JBM)**
**(817) 978-4927 (fax)**
**MageeJ@sec.gov**
**Attorneys for Plaintiff Securities and**
**Exchange Commission**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | |
| | § | **Chapter 11 Case** |
| | § | |
| **LIFE PARTNERS HOLDINGS, INC.,** | § | **Case No. 15-40289-rfn-11** |
| | § | |
| | § | **Expedited Hearing Requested** |
| **Debtor.** | § | |

**MOTION OF SECURITIES AND EXCHANGE COMMISSION UNDER**
**11 U.S.C. § 1104(a)  FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE**

The Securities and Exchange Commission ("SEC"), the largest unsecured judgment

creditor in this case, files this motion, pursuant to Sections 1104(a) and (c) of the Bankruptcy

Code, for appointment of a Chapter 11 trustee for Life Partners Holdings, Inc. ("LPHI" or the

"Debtor"),  and respectfully states the following:

# I.
## <u>PRELIMINARY STATEMENT</u>

This case is in a unique procedural posture.  From the outset,  the Debtor has admitted

that in order to assure that  management "(i) complies with federal securities laws and

regulations, and (ii) does not declare any dividends, make distributions to shareholders, or

otherwise dissipate assets while in bankruptcy,"  the Court needs to appoint a fiduciary to

"exercise a certain degree of oversight and control" over the Debtor.  *See* "Debtor's Motion for

Entry of an Order Appointing Tracy A. Bolt as Examiner with Expanded Powers," dated January

21, 2015 (Dkt. #6) ("Debtor's Examiner Motion").  In other words, the Debtor effectively

concedes that current management cannot be trusted to protect the interests of the estate or its

creditors, or to follow the law, and therefore needs a court-supervised fiduciary to keep watch on

management's actions.  This is an astonishing admission by management that seeks to stay in

possession.  The SEC wholeheartedly agrees that LPHI's management cannot be trusted and that

a fiduciary must be appointed  to protect the interests of all constituencies.  But we contend that

the appropriate fiduciary is an independent Chapter 11 Trustee selected by the Office of the

United States Trustee.  Given management's extensive history of self-enrichment, illegal conduct

and utter disdain for interests other their own, half-hearted measures like those suggested by the

Debtor simply will not suffice.

In addition to the concerns already admitted by the Debtor, the SEC submits that cause

exists for immediate appointment of a Chapter 11 Trustee based on the following facts, which

are discussed in detail below:

- After trial, the United States District Court for the Western District of Texas
  (Nowlin, J.) (the "District Court"), found by order entered on December 2, 2014
  (the "Final Judgment Order"), that LPHI, its CEO, President and single-largest
  shareholder Brian Pardo ("Pardo") and another controlling officer, Scott Peden
  ("Peden") committed "egregious" and "serious violations" of the federal

securities laws, and that they "knowingly – or at least recklessly – violated the securities laws of this nation."[1]

- The District Court also found that "oversight and compliance at Life Partners were non-existent," and that "[e]ven after all of the problems it has had with regulators and the outcome of the trial in this case, LPHI remains a company run and controlled by a man with a history of violating the securities laws, and overseen by an apparently blind Board of Directors.  Plainly, the court would be naïve to assume that anything will change at Life Partners absent intervention by outside forces."  Final Judgment Order, Ex. A, at 7.

- It is undisputed that Debtor paid to Pardo Family Holdings, Ltd., an offshore family trust located in Gibraltar and controlled by Pardo, more than $34 million in dividends since 2002 including over $12.5 million between February 2011 and August 2014 when the Debtor's current assets were reduced from $35.3 million to $5.2 million, and distributed approximately $1.4 million since LPHI lost at trial in the SEC Action.  In addition, Debtor failed to withhold required taxes in 2008, 2009, 2010 when it paid dividends to the offshore Pardo Trust.  Ex. B, LPHI's 1/14/15 Form 10-Q, at p. 25.  As evidenced by the proposed scope of the Debtor's Examiner Motion, LPHI's management has no intention of seeking to avoid or even investigate its prepetition dividends.

- The non-stop distribution of dividends combined with sizeable salaries and bonuses to Pardo and Peden is extraordinary in the face of rapidly declining revenues of the company, and the general decline in the market for life settlements; the issuance of dividends has likely substantially contributed to the Debtor's current desperate financial condition.

- Due to its mismanagement, LPHI is now resorting to require its retail investors to pay administrative policy maintenance fees to maintain their investment interests on pain of "sever[ing] them from the system and all communications with us as well." *See* Pardo Letter of 10/14/14, attached hereto as Ex. C; Dallas Morning News 11/22/14, "Death Bet Investors Ambushed by Surprise Fees," attached hereto as Ex. D; *see also* Declaration of Clyde Jones, attached hereto as Ex. E. LPHI admits in SEC filings that this newly imposed "ministerial fee," and not its profit from operations, is far and away its largest source of income.  Investors who have not paid this additional unexpected fee have been, and continue to be, denied access to information about their investments.

- This administrative fee is being collected by LPI Financial Services, Inc. ("LPFSI"), a newly formed subsidiary of Life Partners, Inc. ("LPI"), which itself is the Debtor's wholly-owned subsidiary and which is also the Debtor's sole source of revenue.  Notwithstanding that the District Court found that LPHI and

---

[1]     *See* Final Judgment Order, entered December 2, 2014 in *SEC v. Life Partners Holdings, Inc., et al.*, 12-cv-33-JRN (W.D.Tex.) at pp. 1-2 & n.1, attached hereto as Exhibit A.

Emergency Motion for Appointment of a Chapter 11 Trustee – Page 3

LPI are one and the same, and the fact that the new fees represent LPI's largest source of revenues by far, Pardo did not cause LPI and LPFSI to file for bankruptcy. Accordingly, LPI and LPFSI are continuing to collect and spend these fees without any oversight or control whatsoever.

- After entry of the Final Judgment Order, Pardo has demonstrated disdain for the rule of law, the district court, and the basis for the verdict and final judgment. His inability to appreciate his prior violations indicates that he poses a serious risk for investors and creditors, and there is a risk of future violations if he is permitted to run the company while LPHI serves as debtor in possession. In recorded public statements to LPHI's sales staff, Pardo characterized the verdicts against LPHI, Pardo and Peden as "minor" and "the equivalent of a traffic ticket in the securities world." *See* Declaration of Senior Trial Counsel J. Magee Transcribing Pardo's Post-Judgment Quotes, attached hereto as Ex. F. Pardo further questioned the District Court's competence by calling it, among other things, "a crazy, out of left field, bizarre ruling," containing "ridiculous fines and sanctions," and stating his belief that the SEC, and not Judge Nowlin, wrote the opinion and that Judge Nowlin "signed it without probably looking at it." *See Id.*

- LPHI admitted in a press release that it filed for bankruptcy protection as an end-run around the District Court's jurisdiction to avoid the appointment of a receiver, stating "[t]he Securities and Exchange Commission had filed a motion with the Federal trial court to appoint a receiver for the Company. Faced with this possibility and having received no other protection requested from the Federal trial court, the Company elected to seek protection under Chapter 11 in order to avoid the appointment of a receiver"). *See* 1/20/15 LPHI Press Release, attached hereto as Ex. G. The record shows that Pardo and Peden are singularly interested in remaining in control of the Company. But the record shows them to be inappropriate fiduciaries for creditors and shareholders.

## II.
## FACTS

### A.    The Final Judgment Order

On December 2, 2014, after a trial by jury, the District Court entered the Final Judgment Order, finding that LPHI violated Section 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") by filing forms with the SEC that contained materially false statements and/or omissions of fact, and also finding that Pardo and Peden aided and abetted LPHI's violations of Section 13(a) and also violated Rule 13a-4 of the Exchange Act [17 C.F.R. § 240.13a-14] by knowingly filing false and/or misleading certifications with quarterly or annual reports filed with

the SEC.  *See* Ex. A.  The District Court found that Peden's and Pardo's serious misconduct

warranted permanent injunctions against further violations.  *Id.*  The Debtor was ordered to pay

$15 million in disgorgement and $23.7 million in civil penalties, whereas Pardo and Peden were

ordered to pay $6 million and $2 million, respectively, in civil penalties.[2]

The jury found that LPHI, Pardo and Peden committed fraud by violating Section

17(a)(1) of the Exchange Act in connection with the offer or sale of securities.  *See* 2/3/14

Verdict Form, attached hereto as Ex. H.  Although the Court set aside that verdict because it

determined that LPHI's and Pardo's securities fraud was committed during a time that was

outside of the temporal scope of the SEC's Section 17(a) charge, the Court nonetheless found

that "[t]he record did indeed contain evidence that Defendants knowingly—or at least

recklessly—violated the securities laws of this nation."  Final Judgment Order at 4, n.1.

The Court further found facts that go to the heart of LPHI's management's lack of

competence to stay in possession.  For example, the Court found

> "LPHI, Pardo, and Peden deprived the investing public of information that is needed to
> make an informed decision about whether to invest in Life Partners.  Given that
> disclosure is the basis of American Securities law, these are serious violations."

Final Judgment Order at 3. It also found "a great deal of evidence . . . that Defendants

understood that Life Partners may not have been complying with the company's legal

obligations," but nonetheless "resisted any change of course" by, for example, Pardo's

"threaten[ing] to sue his own auditor unless it signed off on LPHI's accounting methods" after

the outside auditor informed Pardo that "it could not sign off on LPHI's financial disclosures due

to its belief that LPHI's accounting practices were not in compliance with GAAP."  Final

Judgment Order at 4.

---

[2]  On January 16, 2015, the District Court denied all parties' motions to alter or amend the judgment under FED. R.
CIV. P. 59(e) and entered a standalone Final Judgment against Debtor, Pardo, and Peden reiterating the relief ordered
in its prior Final Judgment Order, attached hereto as Ex. I.

Importantly, the Court noted the lack of oversight and compliance by LPHI's

management and Board of Directors, notwithstanding a history of securities issues with the SEC

and the Colorado Securities regulator.  Notwithstanding LPHI's "ouster from the Colorado

market," the District Court found that "oversight and compliance at Life Partners were non-

existent."  Final Judgment Order, Ex. A, at 5.  Noting that Mr. Pardo controls the Board of

Directors of LPHI, the Court found that

> So far as the Court can tell, nothing has changed at LPHI as a result of the failures that
> are the subject of this case, and the Court can only assume that this is because Pardo [who
> holds a 51% stake in LPHI] does not want anything to change.  Even after all of the
> problems it has had with regulators and the outcome of the trial in this case, LPHI
> remains a company run and controlled by a man with a history of violating the securities
> laws, and overseen by an apparently blind Board of Directors.  Plainly, the Court would
> be naïve to assume that anything will change at Life Partners absent intervention by
> outside forces."

*Id.* at 6-7.

**B.**  **The Company's Issuance, and Pardo's Receipt, of Millions of Dollars in Dividends
During the Litigation Has Contributed to the Company's Current Insolvency.**

LPHI's public filings confirm a steady but sharp decline in LPHI's total and current

assets:[3]

| Balance Sheet Date | Cash and Cash Equivalents | Total Current Assets |
|---|---|---|
| 2/28/11 | $27.6 million | $35.3 million |
| 2/29/12 | $11.4 million | $18.5 million |
| 2/28/13 | $7.5 million | $15.7 million |
| 2/28/14 | $6.1 million | $8.4 million |
| 8/31/14 | $3.06 million | $5.2 million |

It is undisputed that LPHI recognizes income from life settlements at the time settlement

closes; *i.e.*, when the investor purchases his or her interest in a life insurance policy.  It is also

undisputed that, whereas LPHI brokered six settlements in the third quarter of last year, it closed

---

[3] *See* LPHI's Forms 10-K for FYs 2011—2014, http://ir.lphi.com/sec.cfm?DocType=Annual&Year= , and October
15, 2014 Form 10-Q for the period ended August 31, 2014, http://ir.lphi.com/sec.cfm?DocType=Quarterly&Year=.

only two this year.  *See* 1/14/15 10-Q, Ex. B, at 18.  Without the inclusion of the newly assessed

administrative fees charged to retail investors beginning in the most recent quarter but assessing

charges dating back to September 2013 (as explained more fully *infra* at pp. 9-11), the Company

would have suffered a net loss of $2.6 million.  *Id.*.  The Company recognizes that the SEC's

action has impacted demand for the Company's services, and a "general decline in the life

settlement markets."  *Id.* at 19, 21.  Moreover, "recurring operations are not currently generating

sufficient cash to support operations."  *Id.*

Despite steeply declining assets, a downturn in its business, and falling stock prices,

Pardo testified at trial in the SEC Action that LPHI has issued dividends every quarter since

2007.  *See* 1-28-14pm D.Ct. Tr., attached hereto as Ex. J, p. 5; *see also*

http://ir.lphi.com/dividends.cfm.  LPHI paid out more than $68 million in dividends between

February 2, 2002 and September 17, 2014 without missing a quarter.  *See*

http://ir.lphi.com/dividends.cfm.  Since the SEC Action was filed, LPHI has issued nearly $15

million in dividends, including more than $2.7 million in three separate dividends issued *after*

the jury returned its verdicts against the Debtor, Pardo and Peden.  *Id.*  And yet, now that the

SEC has a substantial judgment, LPHI is cash-poor, cannot secure a bond to stay execution of the

District Court's judgment pending its appeal, and has sought relief in bankruptcy – on the eve of

the District Court's hearing on its Emergency Motion for Appointment of Receiver no less,

which hearing neither Debtor nor its counsel attended.[4]

Importantly, Pardo admitted at trial that Pardo Family Holdings, Ltd. – the family trust he

directs and which is located offshore in Gibraltar ("Pardo Trust") – owns more than half of

---

[4] Western District of Texas Magistrate Judge Andrew Austin presided over a January 21, 2014 hearing on Pardo and
Peden's motions to set supersedeas bond and the SEC's emergency motion for appointment of receiver.  Judge
Austin refrained from deciding the SEC's motion to appoint receiver in favor of the agency first seeking the same or
similar remedy herein.  It is undisputed that neither LPHI nor its bankruptcy counsel attended or participated in the
hearing.

LPHI's stock and, whenever LPHI issues dividends, the Pardo Trust receives more than half of the funds. *See* 1-28-14pm D.Ct. Tr., attached hereto as Ex. J, at p. 5.[5] Hence, the Pardo Trust has received more than $34 million since February 2, 2002, including $7.5 million since the SEC filed its case in January 2012, and $1.4 million just since Debtor, Pardo, and Peden lost at trial. There is no doubt this money is for Pardo's benefit. For example, during just the time period of November 2010 through June 2011, transfers totaling $1.4 million were made for the benefit of Pardo's personal companion. [See financial transfer records attached hereto as Ex. X]. Equally troubling, LPHI failed to withhold taxes on dividends paid to the Pardo Trust in 2008, 2009, and 2010, as required by 26 U.S.C. § 1461.[6] LPHI also continues to pay Pardo and Peden's sizeable salaries and bonuses,[7] though each of them claimed extreme financial hardship before the District Court and asked the Court to relieve them of their obligation to pay the judgments, or post any bond securing the judgments, entered against them. *See* Pardo and Peden's respective motions to Set Amount and Type of Security Pending Appeal, filed under seal over the SEC's opposition in the District Court. [See Case No. 1:12-cv-00033-JRN-AWA Docket Nos. 328 and 326].

**C.    LPHI's Management is Incompetent to Stay in Possession.**

**1.    The District Court Found Pardo's Hand-Picked Audit Committee Chair to be "Profoundly Dishonest or Amazingly Uninformed."**

---

[5] Pardo is the beneficial owner of the Pardo Trust which means he has "sole or shared power to vote or dispose of the stock." *See* http://www.nasdaq.com /investing/glossary/b/beneficial-owner. Pardo admitted at trial that Peden acted as the Pardo Trust's attorney-in-fact. *See* D.C. Trial Tr., 1-28-14pm Tr., at pp. 8-9, attached hereto as Ex. K; D.C. Tr. Ex. G-435, attached hereto as Ex. L. He further admitted that he exercises the shareholder vote for the Pardo Trust, has authority to act for the Pardo Trust and has directed transactions of LPHI stock by the Pardo Trust. *See* D.C. Trial Tr. 1-28-14pm at pp. 11-12, 13-14, attached hereto as Ex. M.; D.C. Trial Ex. G-209, attached hereto as Ex. N.

[6] http://files.shareholder.com/downloads/LPHI/3714485070x0xS1144204-14-61250/49534/filing.pdf , at p. 16

[7] Pardo was paid $667,261 in salary and bonuses in FY 2014 according to LPHI's July 2, 2014 Proxy Statement, which omits any reference to Peden's executive compensation. Peden was paid $204,528 in FY 2013.

Indeed, it is business as usual at LPHI regardless of the jury's verdicts in the SEC Action,

the Final Judgment Order, and the company's dire financial circumstances. LPHI has made no

changes to its roster of officers and directors: Pardo is still CEO and Chairman of LPHI's Board

of Directors, and Tad Ballantyne, whom the District Court found to be "a man whose testimony

revealed him to be either profoundly dishonest or amazingly uninformed about the company

whose shareholders he has a fiduciary responsibility to protect," (Final Judgment Order, Ex. A,

at 6), is still a Director, Chairman of its Audit Committee, and a member of the Compensation

Committee. *See http://lphi.com/Officers.htm.*

> **2.  LPHI Imposed a New Fee on its Retail Investors on Pain of Severing Them From Their Investments to Make up for its Revenue Shortfall, and has Kept Those Revenues Outside of the Jurisdiction of the Court.**

Since losing at trial, LPHI has announced *one* key change in Life Partners' business

model. On October 14, 2014, Pardo informed retail investors of their newly-created obligation

to pay administrative policy maintenance fees in order to maintain their investment interests. *See*

Letter of October 14, 2014, Ex. C. In response to unrest among the thousands of retail investors

due to the new fee, Pardo told *The Dallas Morning News* that, if investors fail to pay the fees,

"we will sever them from the system and all communications with us as well." *See* Dallas

Morning News Article, Ex. D. Thus, LPHI's retail investors face the likelihood that LPHI will

follow through on its clear threat to cut off investors' life settlement interests. Indeed, LPHI has

already cut off many investors' access to their online accounts and caused them to abandon their

property interests. *See, e.g.,* Declaration of Clyde Jones, attached hereto as Ex. E; Declaration of

Magdalena Stovel, attached hereto as Ex. O.

LPHI admits that LPHI's far-and-away largest current source of income ($4,399,591 for

the third quarter of fiscal year 2015 ended November 30, 2014) is derived from its newly devised

"ministerial fee" now charged to every single one of its retail investors.  *See* 1/14/15 LPHI

Form10-Q, Ex. B, at p. 18.  LPHI further admitted that, "without this billing, [they] would have

realized a net loss, before taxes, of ($2,687,719) for the Third Quarter of this year."  *Id.*  This

practice may itself be improper and appears to flow from the very misconduct at issue in the SEC

Action.  Certainly, the fee was not presented or disclosed to retail investors when they purchased

Life Partners' uniquely illiquid investments.  *See* Declarations of Marshall Amis, Kathy

Hellstrom, Clyde Jones, and Paula Wingate, attached hereto as Ex. P, Q, E, and R, respectively.

And the fee – truly a ransom against retail investors' property interests – is the central issue in a

recent lawsuit filed by investors.  *See* Amended Original Petition filed in the 414th Judicial

District Court of McLennan County, Cause No. 2014-4564-5, styled *William S. Eastwood,*

*Russell J. Bowman and Kristina A. Bowman v. Life Partners, Inc. & LPI Financial Services,*

*Inc.*, attached hereto as Ex. S.  This fee, of course, is the result of LPHI's knowing sale of life

settlements with underestimated life expectancies.  As the District Court found, Life Partners

sold life settlements they could foresee would fail to mature within the timeframe represented to

investors and, now, it is requiring those investors to pony up additional fees to maintain their

investments – in addition to their unanticipated but considerable, ongoing premium obligations

just to maintain the policies – lest their interests be deemed "abandoned" by Life Partners and

resold to new investors as another revenue stream for the Debtor.

Equally  important is the fact that this fee is being collected by LPFSI and paid to LPI,

the Debtor's operating subsidiary that is the only source of the Debtor's revenues and which

Pardo has not put into Chapter 11, notwithstanding the fact that the District Court found that

LPHI and LPI are one and the same.  *See* D.Ct. Order, dated November 19, 2013, attached hereto

as Ex. T, at pp. 4-5 Right now, LPFSI and LPI are continuing to collect, and spend, those fees

without any oversight or control whatsoever.

> **3.      LPHI's Actions Have Harmed its Public Shareholders and its Retail
> Investors.**

In filings in the SEC Action, LPHI argued that "[t]he SEC has not identified anyone who

has 'already been injured' by LPHI's actions." *See* D.Ct. Doc. 347, LPHI's Response in

Opposition to Emergency Motion for Appointment of Receiver, attached hereto as Ex. U, at p. 4.

This statement is, unfortunately, not surprising.  After all, Pardo has touted that the jury's verdict

amounted to a "traffic ticket" and that the Court's Final Judgment is a "crazy, out of left field,

bizarre ruling" that he is confident Judge Nowlin did not himself write, but was somehow duped

by his law clerk and the Commission into signing.  *See* Pardo's Post Judgment Statements, Ex. F.

These statements alone are compelling evidence that Pardo is not fit to lead LPHI (or any public

company) and cannot be trusted to protect the interests of current or future investors or Debtor's

creditors.  Additionally, as the jury found and the Court upheld, Pardo and Peden lied to

everyone outside of LPHI about their use of materially misstated life expectancies.  *See* D.Ct.

Doc. 247, pp. 30-31; D.Ct. Doc. 279, pp. 11-12, attached hereto as Ex. V and W, respectively.

The District Court was explicit about who was harmed by this conduct: both Life Partners' retail

investors and LPHI's shareholders (who, ironically, "obtained a windfall on the backs of LPI

retail customers' ignorance" until "the music finally stopped").   Final Judgment Order, Ex. A, at

pp. 10-11.

Finally, Pardo's recent statements about the jury verdict and the final remedies judgment

show that he has no appreciation for his violations of the securities laws, or for the importance of

those laws.  *See* Pardo's Post Judgment Statements, Ex. F.

In view of the foregoing, creditors, investors and all parties-in-interest have been, and continue to be, injured and put at risk under the stewardship of LPHI's current management.

### III.
### THE COURT SHOULD ORDER THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

**A.      Cause Exists To Appoint Based on the District Court's Findings and the Debtor's Dissipation of Assets by Paying Dividends to Insiders.**

Section 1104(a)(1) of the Bankruptcy Code requires the appointment of a Chapter 11 trustee, for cause.  Once the court finds by clear and convincing evidence that cause exists under Section 1104(a)(1), the appointment of a trustee becomes mandatory; there is no discretion.  *In re Cajun Electric Power Coop, Inc.*, 191 B.R. 659, 661 & 662 (Bankr. M.D. La. 1995), *aff'd*, 74 F.3d 599 (5th Cir. 1996).  *See also In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989) ("11 U.S.C. § 1104(a) mandates appointment of a trustee when the bankruptcy court finds cause").

Cause includes, but is not limited to, fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management. *See* 11 U.S.C. §1104(a)(1). Such fraud, dishonesty, incompetence or gross mismanagement may be demonstrated "either before or after the commencement of the case." *See In re Oklahoma Refining Company*, 838 F.2d 1133, 1136 (10th Cir. 1988).  Because the examples of cause in Section 1104(a)(1) are non-exclusive, cause may exist, even in the absence of fraud, dishonesty, incompetence or gross mismanagement.  *Cajun*, 191 B.R. at 661.  Moreover, "a determination of cause is within the discretion of the court."  *Sharon Steel*, 871 F.2d at 1226.

Here, cause exists for the appointment of a Chapter 11 trustee under Section 1104(a)(1). The District Court made explicit findings that LPHI lacks competent oversight by current management and that it "would be naïve to assume that anything will change at Life Partners absent intervention by outside forces." Final Judgment Order at p. 7.  Moreover, the Debtor's

prepetition payment of dividends, most of which went to insiders, while the Debtor's current

assets were diminishing is further evidence of gross mismanagement of the Debtor.   In *Sharon

Steel*, the Third Circuit affirmed appointment of a Chapter 11 Trustee where the bankruptcy

court found that the debtor's bankruptcy was caused, at a minimum, by the debtor's "careless

management practices" which included payment of substantial sums to insiders for no

consideration at a time when the company was cash poor, and transfers of cash and assets to

affiliates which the debtor failed to seek to recover in the bankruptcy case.  *Sharon Steel*,  871

F.2d at 1226-27.  Pardo's recent statements about the verdict and the district court's orders

demonstrate a lack of appreciation for his prior misconduct, and underscore that he is an

inappropriate leader of a debtor that has sought to reorganize under Chapter 11 as debtor in

possession.  The Debtor's attempt to install a cherry-picked examiner with limited duties while

its current management stays in possession is simply insufficient to overcome the factual record

here, which amply demonstrates cause to appoint a Chapter 11 Trustee.  *See Sharon Steel*, 871

F.2d at 1227 (rejecting debtor's argument that the court's authorization of the creditors'

committee to sue to recover the transfers and the installation of a new chief operating officer

obviated the need for a Chapter 11 Trustee).

**B.     Appointing A Chapter 11 Trustee Is In The Best Interests Of The Debtor's
Creditors.**

Even if cause does not exist to appoint a trustee under Section 1104(a)(1), the Court

possesses broad discretion to appoint a trustee "if such appointment is in the interests of

creditors, any equity security holders and other interests of the estate." <u>See</u> 11 U.S.C. 1104(a)(2).

*See also Sharon Steel*, 871 F.2d at 1226 ("Subsection (a)(2) also creates a flexible standard,

instructing the court to appoint a trustee when doing so addresses 'the interests of the creditors,

equity security holders, and other interests of the estate.").  When analyzing whether a trustee is

in the creditors' best interests, the court should consider both the protections that will be afforded

by the appointment of a trustee and the relative cost that is associated with the appointment. *See*

*Cajun*, 191 B.R. 659, 661. But when the need for a trustee becomes unavoidable to protect

parties in interest, then the cost/benefit factor carries little weight, since the goal of protecting

creditor interests is paramount to the goal of minimizing costs to the estate. *In re SunCruz*

*Casinos, LLC*, 298 B.R. 821, 829 (Bankr. S.D. Fla. 2003) ("If the appointment of a trustee

becomes unavoidable in the protection of parties in interest, the cost/protection factor must

necessarily supersede a cost/benefit factor, even to the extent of a depletion of the estate.")

(citations and internal quotations omitted).

Here, the Debtor has already admitted that an independent fiduciary should be appointed

to alleviate concerns by the SEC, other creditors, and parties-in-interest. A Chapter 11 Trustee is

necessary to instill confidence that the Debtor properly exercises its fiduciary duties to the estate.

## IV.
## CONCLUSION

The District Court correctly anticipated the need for an independent fiduciary to be

appointed over LPHI in its remedies order: "the Court would be naïve to assume that anything

will change at Life Partners absent intervention by outside forces." Final Judgment Order at p. 7.

Since the SEC case began, LPHI has stripped the company of millions in dividends that enriched

the Pardo Trust. Since the verdicts were returned against LPHI, Pardo and Peden in the SEC

Action, they continued to issue dividends and claimed – and today continue to claim – total

victory at trial and complete exoneration by Judge and Jury. And even after the District Court's

harsh criticisms of LPHI and its unchanged Board of Directors, Defendants ignore the fact that

they violated important federal securities laws and went to great efforts to persuade the public,

through its trusted sales force, that it is business as usual at Life Partners because the Court's

"ridiculous" Final Judgment represents a mere "speeding ticket" that the District Court did not itself consider or write and which will surely be overturned. Finally, when Pardo decided to put LPHI into bankruptcy to avoid the appointment of an equity receiver, he ensured that he could continue to control LPI, LPFSI and their income stream outside of the purview of the bankruptcy court by failing to include them in the bankruptcy filing. Simply put, LPHI, Pardo and Peden have revealed themselves to be altogether unwilling to accept responsibility, admit wrongdoing, and work to protect the interests of their creditors, public shareholders, and their retail investors who they intentionally misled and harmed and are continuing to harm today.

For all of the foregoing reasons, the SEC respectfully requests that the Court (i) order the appointment of a Chapter 11 Trustee over LPHI and (iii) order such other and further relief as is just.

Dated: January 23, 2015

Respectfully submitted,

*/s/ Jessica B. Magee*
Jessica B. Magee
Texas Bar No. 24037757
Matthew J. Gulde
Illinois Bar No. 6272325
B. David Fraser
Texas Bar No. 24012654
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6465 (JBM)
(817) 978-4927 (fax)
*MageeJ@sec.gov*
Attorneys for Plaintiff Securities and
Exchange Commission

TAB 4

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

John M. Barr,

          Petitioner,

v.

U.S. Securities and Exchange
Commission,

          Respondent.

Case No. 23-_____



U.S. COURT OF APPEALS
**RECEIVED**
**Apr 24, 2023**
FIFTH CIRCUIT

## PETITION FOR REVIEW

Pursuant to 15 U.S.C. 78u-6(f), 17 C.F.R. 240.21F-13, and Fed. R. App.

P. 15(a), Petitioner John M. Barr hereby petitions the U.S. Court of Appeals

for the Fifth Circuit to review the *Order Determining Whistleblower Award

Claims* (Notice of Covered Action 2015-036; Release No. 97202; File No. 2023-

42), entered by the U.S. Securities and Exchange Commission on March 27,

2023 (attached as Appendix A).[1] That order misreads the operative statute and

contains multiple prejudicial errors that violate Mr. Barr's legal rights. This

Court has jurisdiction to review the order under 15 U.S.C. 78u-6(f) and

---

[1] At the SEC's request, Mr. Barr is attaching the public, redacted version of
the final order to avoid any confidentiality concerns involving other claimants
(who are not parties to this proceeding).

17 C.F.R. 240.21F-13, and venue is proper because Mr. Barr resides in this circuit. See *ibid.*

Mr. Barr respectfully submits that the order is unlawful and defective on multiple grounds, including that it is arbitrary and capricious, an abuse of discretion, unsupported by evidence, contrary to the Securities Exchange Act of 1934 and the Dodd-Frank Wall Street Reform and Consumer Protection Act, procedurally and substantively flawed, and otherwise not in accordance with law. See 5 U.S.C. 706(2)(A). Mr. Barr requests that the Court vacate or modify the order, in whole or in part, and otherwise provide all appropriate relief to which Mr. Barr may be entitled.

Respectfully submitted.

/s/ *Daniel L. Geyser*

J. Kevin Edmundson                    Daniel L. Geyser
EDMUNDSON SHELTON WEISS PLLC          HAYNES AND BOONE, LLP
600 East Highway 290                  2323 Victory Avenue, Ste. 700
Dripping Springs, TX  78620           Dallas, TX  75219
Tel.: (512) 720-0782                  Tel.: (303) 382-6219
*kevin@eswpllc.com*                   *daniel.geyser@haynesboone.com*

*Counsel for Petitioner John M. Barr*

April 24, 2023

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 15(c) and 25(d), I hereby certify that on April 24, 2023, an electronic copy of the foregoing Petition for Review was filed with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit, using the appellate CM/ECF system. I further certify that I have caused the foregoing petition to be served on the following parties by electronic mail and first-class mail:

> Megan Barbero, General Counsel
> Stephen Yoder, Senior Litigation Counsel
> Emily True Parise, Senior Litigation Counsel
> Office of the General Counsel
> U.S. Securities and Exchange Commission
> 100 F. Street, N.E.
> Washington, DC  20549
> *OGC@sec.gov*
> *YoderS@sec.gov*
> *PariseE@sec.gov*
>
> Nicole C. Kelly, Chief
> Emily Pasquinelli
> Kristina Guidi
> Office of the Whistleblower
> U.S. Securities and Exchange Commission
> 100 F. Street, N.E., Mail Stop 5631
> Washington, DC  20549
> *KellyN@sec.gov*
> *PasquinelliE@sec.gov*
> *GuidiK@sec.gov*

*/s/ Daniel L. Geyser*
Daniel L. Geyser
HAYNES AND BOONE, LLP
2323 Victory Avenue, Ste. 700
Dallas, TX  75219
Tel.: (303) 382-6219
*daniel.geyser@haynesboone.com*

April 24, 2023

TAB 5

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2023, an electronic copy of the foregoing Record Excerpts were filed with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit, using the appellate CM/ECF system. I further certify that all parties in the case are represented by lead counsel who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Daniel L. Geyser*
Daniel L. Geyser
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Ste. 2300
Dallas, TX  75201
Tel.: (303) 382-6219
*daniel.geyser@haynesboone.com*

October 13, 2023